UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**AS MODIFIED**

| | |
|---|---|
| **NAUTIMILL S.A.**<br>**Plaintiff,**<br><br>**VERSUS**<br><br>**LEGACY MARINE TRANSPORTATION, LLC**<br>**Defendant,** | **CASE NO.: 15-1065**<br><br>**JUDGE:**<br>**SARAH S. VANCE "R"**<br><br>**MAGISTRATE:**<br>**MICHAEL B. NORTH (5)** |

## PRETRIAL ORDER

1. **PRETRIAL CONFERENCE DATE**:

   Pretrial conference was held on June 30, 2016 at 3:00 p.m.

2. **APPEARANCE OF COUNSEL**:

   Machale A. Miller, Esq.
   Iliaura Hands, Esq.
   MILLER & WILLIAMSON LLC
   1515 Poydras Street, Suite 2130
   New Orleans, Louisiana 70112
   *Attorneys for Plaintiff, Nautimill S.A.*

   Mr. Robert J. Burvant
   Mr. John A. Cangelosi
   KING, KREBS & JURGENS, P.L.L.C.
   201 St. Charles Avenue, 45th Floor
   New Orleans, Louisiana 70170
   *Attorneys for Legacy Marine LLC.*

   Mr. Joseph R. McMahon, III
   110 Ridgelake Drive
   Metairie, LA 70001
   *Attorney for David Hasselman and International Marine Sales & Export LLC.*

3. **DESCRIPTION OF THE PARTIES**:

   Plaintiff, Nautimill S.A. (Nautimill) is a foreign corporation organized and existing under

the laws of Uruguay, engaged in the business of providing operational and logistical services in

the inland marine carriage of goods by barge industry, towing and pushing barges in Uruguay.

Defendant, Legacy Marine Transportation, LLC ("Legacy Marine"), is a Louisiana limited liability company with its principal place of business located at 265 Company Canal Road, Bourg, Louisiana 70343.   Legacy Marine, in conjunction with its affiliated companies R&R Boats, Inc. ("R&R Boats") and Diversified Marine Services, LLC ("Diversified"), is engaged in the business of building, operating, buying and selling pushboats, crewboats and other vessels.   Legacy Marine filed a Third-Party Demand against David Hasselman ("Hasselman") and International Marine Sales & Exports, LLC ("IMSE"), who responded with a counterclaim against Legacy Marine.

David Hasselman is a person of the full age of majority domiciled in Brevard County, Florida.

IMSE is a Florida limited liability company with its principal place of business in Bevard County, Florida.

## 4.    JURISDICTION:

Jurisdiction over Nautimill's and Legacy Marine's claims in this matter is based 28 U.S.C. §1332, as the amount in controversy exceeds the sum of $75,000.00 exclusive of interest and costs, and the parties are of diverse citizenship.

Nautimill's Complaint includes claims for fraudulent misrepresentation, negligent misrepresentation, redhibition, breach of the warranty for ordinary use and breach of contract against Legacy Marine arising out of its purchase of the pushboat M/V LEGACY SERVER (the "Vessel") from Legacy Marine in April of 2014. Nautimill's claims are premised on alleged misrepresentations made by Legacy Marine concerning the horsepower of the main engines installed on the Vessel, as well as alleged misrepresentations concerning the age and condition of the engines and other equipment installed on the Vessel.

Legacy Marine instituted a third-party demand against Hasselman and IMSE seeking contribution and indemnity, as well as damages, because the misrepresentations complained of by Nautimill were, in fact, made by Hasselman and/or IMSE to Nautimill, and not by Legacy Marine.

Hasselman and IMSE have instituted a counterclaim against Legacy Marine for certain commissions that Nautimill failed to pay Hasselman and/or IMSE, as well as damages that allegedly occurred to the Vessel during transport.

5.      **PENDING AND CONTEMPLATED MOTIONS**:

Presently pending before this Court is Legacy Marine's motion for summary judgment seeking the dismissal of all claims asserted by Nautimill (Rec. Doc. No. 49), as well as Legacy Marine's motion for summary judgment seeking the dismissal of Hasselman's and IMSE's counterclaim (Rec. Doc. No. 50).   These motions were submitted to the Court on June 15, 2016.

Legacy Marine anticipates filing a motion *in limine* to exclude any evidence of consequential damages in the form of lost profits claimed by Nautimill on the grounds that Nautimill's Complaint contains no claim for lost profits.

6.      **STATEMENT OF MATERIAL ISSUES OF FACT**:

   a. **By Nautimill**:

On November 13, 2013 Nautimill, through its president, Mr. Ruben Varela ("Varela") approached a boat broker in Florida, Mr. David Hasselman ("Hasselman") of International Marine Sales and Export, LLC (ISM&E), with whom Nautimill had a long history of purchasing new and used marine equipment and parts in the United States, to assist in locating a 2,000 horsepower pushboat for Nautimill to purchase and to thereafter place in service with Constructora OAS S.A ("OAS") in the Regasificadora Gas Sayago project in Uruguay earning $8,000 per day. Mr. Hasselman offered the M/V LEGACY SERVER (now M/V DOSCAPI S), which he had

previously seen during one of his visits to the defendant's yard in Louisiana while it was being built by Legacy's sister company, R&R. On that visit R& R and Legacy's owner and president, Mr. Robert Boudreaux ("Boudreaux"), represented the vessel was fitted with two 1,000 HP engines.

In mid-February 2014, Hasselman was in the Louisiana area with two Uruguayan Navy officers, Jorge Perez Castro and Edgardo Costa Gonzalez, who had come to Louisiana to perform a vessel inspection and sea trial of another vessel, the M/V JAKE RYAN, for another of Hasselman's Uruguayan customers. Taking advantage of the fact that the Uruguayan officers had some spare time, Hasselman arranged for them to visit the M/V LEGACY SERVER to assist Nautimill in deciding whether to purchase the vessel. The purpose of their visit to the vessel was not to perform a full-blown inspection, as they had performed on the M/V JAKE RYAN, as would be required for registering the vessel under the Uruguayan flag. Instead, the purpose was to provide feedback to Nautimill as to the general condition of the vessel. The officers toured the vessel including the engine room at which time one of the officers, Capt. Jorge Perez, noticed that the control panel in the engine room indicated that the engines had only 10 hours of operation, which seemed to confirm Legacy's representation by Mr. Boudreaux that the engines were new with only sea trial hours. The officers also went on a short boat ride. While on the bridge Mr. Boudreaux represented to the Uruguayan officers and to Mr. Hasselman that the engines of the M/V LEGACY SERVER were 1,000 HP each, for a total of 2,000 HP. Accordingly, inasmuch as the vessel was represented to be a new construction with all equipment manufacturer's warranties passing to Nautimill, and inasmuch as the vessel apparently meet all of Nautimill's requirements for the intended service with OAS, Nautimill agreed to purchase the vessel for $2,200,000.

The vessel then traveled from Louisiana to Houston on its own power under the command

of R&R's employees, and once in Houston it was loaded onto the ocean vessel M/V GDANSK which carried it to Uruguay arriving there on or about May 25, 2014.

Upon arrival in Uruguay, and while the vessel was still on the deck of the M/V GDANSK, Nautimill's representatives noticed for the first time that the propellers appeared to be of different sizes. The vessel was discharged; and, while Nautimill attempted to obtain the required licensing and registration for its new vessel under the Uruguayan flag, the Uruguayan authorities discovered that the engines were not properly identified as they did not have any identification plates or serial numbers. Nevertheless, Nautimill was able to obtain a provisional permit allowing it to move the vessel some 150 miles away from Montevideo to the city of Carmelo, for the purpose of making modifications to the vessel's living quarters and increasing its housing capacity from four crewmembers to six.

The vessel was christened on July 4, 2014. Due to the lack of engine plates and unknown serial numbers, Nautimill could not reassure to OAS that the vessel indeed had the requisite  2,000 HP capacity. For that reason Nautimill was relegated to engaging the vessel in another service, also for OAS, that called for two vessels of a lower horsepower at a reduced daily rate of $4,000 instead of the expected rate of $8,000 per day for a 2,000 HP vessel. The vessel started operating for OAS on July 13, 2014.

On September 1, 2014, to properly identify and document the engines, Nautimill engaged a local Caterpillar representative, Finning CAT, to inspect the engines. Finning determined that the turbocharges and aftercoolers needed to be chemically cleaned even though the vessel had been operated for less than 300 hours in the short time after delivery to Nautimill. This type of maintenance work usually is required after far more than 300 hours of operation. Additionally, Finning was unable to identify the engines as manufactured by Caterpillar because in reality they

had been completely rebuilt in-house by the mechanics of Legacy's sister company, R&R Boast ("R&R"), and Caterpillar had not certified or commissioned their work. Without breaking down the engines and conducting an in-depth inspection, the only Caterpillar components that could be identified are the engine blocks and very few of the parts used in the rebuilding, which R&R had purchased from local retailers in Louisiana. The majority of the parts that went into the rebuilding of the engines however remain of an unknown source and condition because they came from R&R's inventory. Accordingly, to rebuild the engines R&R's mechanics used Caterpillar engine blocks and then fitted these blocks with a hodge-podge assortment of unidentified parts of unknown sourcing. Thus, it cannot be said that these are truly Caterpillar engines but merely a generic compilation of engine parts, with one of the engine blocks not even having a legible or traceable serial number because it has been scratched-out in an apparent effort to conceal its identity.

In the meantime, to comply with the request of the local authorities to identify the engines, identification plates were obtained from Mr. Hasselman, who had them fabricated based on the serial numbers that Legacy had previously provided just prior to the delivery of the vessel as belonging to the engines of the M/V LEGACY SERVER, when in reality they were not the serial numbers for the engines installed on the vessel. One of the serial numbers Legacy supplied was that of an electronic engine, but neither of the engines installed is electronic. Subsequently, on November 21, 2014 Nautimill retained the services of a Florida company, Frank & Jimmie's Propeller, to determine the true horsepower of the engines. Frank & Jimmie's performed a "true torque strain gage test" which determined that the port engine had a maximum capacity of 591 HP and the starboard of 614 HP, thereby confirming that the engines are not of the 1,000 HP that Legacy represented them to be, nor are they of the 800 HP that legacy contends was the represented

horsepower.

Legacy maintains that it always represented the vessel as fitted with reconditioned engines. This representation purportedly was made verbally to Mr. Hasselman, but he denies ever being informed or otherwise knowing that they were rebuilt. Legacy also maintains that the horsepower was represented as 800 per engine in R&R's website and in an advertisement that R&R placed in the Boats & Harbor magazine. But neither Nautimill nor Hasselman ever saw these materials prior to the sale. Legacy argues that Hasselman had a motive to lie to Nautimill and to conceal the used or rebuilt condition of the engines because he stood to lose the commission from the sale of the vessel. This is not true. Mr. Hasselman has no motive to lie when he affirms that he did not know the engines were rebuilt. First, in his prior dealings with Nautimill he has sold to them equipment that he has represented it to be used. Therefore, there is no reason for him to conceal the used condition of the engines. Had he known of the true condition, he would have disclosed it to the client like he has done in their many prior dealings, and it would have been up to Nautimill to decide whether to buy it or not, or to perform a more in depth inspection. Additionally, Mr. Hasselman's actions in this case clearly show that he was but another victim of Legacy's misrepresentations in more than one occasion (twice to be precise); and his actions are consistent with someone who believed the engines were new and of the desired horsepower, always having his client's best interest at heart.

First, with respect to the M/V LEGACY SERVER, on March 28, 2014, prior to the completion of the sale, when Nautimill contemplated purchasing spares for the engines, Hasselman recommended to Nautimill that there was no need to purchase spare parts because the engines were new. The purchase of additional equipment such as spare parts is actually in Hasselman's best interest because he would make an additional commission from that additional purchase.

Therefore, recommending against the purchase of spares is an indication of the level of honesty with which he conducted himself. Also, on April 4, 2014, when Legacy forwarded the first draft of the Bill of Sale, Mr. Hasselman rejected it and complained that the "AS IS, WHERE IS" language in the warranty is not what was discussed with Legacy's president, and insisted that the same be changed to state that the equipment was warranted by the various manufacturers. The equipment of course included the engines, which Hasselman believed to be new and still under warranty. Hasselman, once again had his client's best interest at heart. Then on June 17, 2014 Hasselman wrote to Nautimill's president, Mr. Varela, recommending that he follow the manufacturers recommended maintenance in order to maintain the engine warranty and to only use OEM parts until the warranty expires. These actions are therefore consistent with the understanding that the engines were new and under warranty.

The second time Mr. Hasselman was subjected to Legacy's and R&R's misrepresentations was when Hasselman attempted to purchase another set of Caterpillar 3412 DITA engines (the same model engines as those on the M/V LEGACY SERVER). R&R represented the engines to be "Brand New," "Old Stock." "Not rebuild. Never put in service," but in reality they were used engines which R&R had purchased knowing they were used. Due to the deception Mr. Hasselman backed out of the deal and lost the opportunity to make a commission out of that sale. Therefore, Hasselman had no reason to lie to Nautimill and conceal the fact that the engines were used or not of the required horsepower. Just as he did with the Nigerian client's purchase, he would have cancelled the sale of the vessel that did not meet Nautimill's requirements and moved on to another supplier. Boudreaux on the other hand, needed to sell the vessel, and what better opportunity than to sell it to a foreign customer who may not be able to discover the true condition until it is too late after the vessel was thousands of miles away in another country. Hasselman's actions therefore

demonstrate a high degree of integrity and transparency in his business dealings not only with Nautimill but with his other customers such as the Nigerian client.

Although it is true that the R&R website and the advertisement in the Boats & Harbors magazine state that the total capacity of the vessel was 1,600 HP (800 HP each engine), neither Nautimill nor Hasselman ever saw them prior to the purchase, and neither source expressly state that the engines are rebuilt, that the engines are not Caterpillar certified or commissioned engines, that the engines are not "twin" engines because each has a different horsepower, and that the propellers are different. Legacy's failure to disclose those important facts demonstrates a clear attempt to mislead a trusting buyer such as Nautimill, and by simply representing the vessel as a "new built," Legacy successfully mislead Nautimill and Hasselman into believing that the entire vessel, including its propulsion equipment, was also new, so that there was no need to verify their condition.

There is no question that had Legacy been forthcoming with this critical information Nautimill and Hasselman would have taken a different approach prior to the purchase, and a more detailed inspection of the engines would have been carried out. Interestingly, Legacy argues that everyone in the industry should have known that the engines of the M/V LEGACY SERVER were rebuilt by simply looking at the make and model of the engines (Caterpillar 3412 C DITA) because that model of engines has been out of production for a very long time. However, Mr. Boudreaux's own representations in trying to sell the other set of engines to Hasselman's Nigerian client contradict this allegation because at that time Boudreaux represented the same model of engines as "Brand New," "Old Stock." "Not rebuild. Never put in service," so that he in fact believed Caterpillar 3412 engines could still be found unused.

Nautimill calculates that in order to bring the M/V LEGACY SERVER to a 2,000 HP

vessel, it will be required to spend $671,060 to replace the engines. Additionally, Nautimill asserts a loss of revenue of $1,108,000 resulting from its inability to engage the vessel in the service with OAS as initially intended earning $8,000 per day for a period of 1 year.

### b. By Legacy Marine:

The factual allegations of Nautimill's Complaint against Legacy Marine are contained in a section entitled: "General Allegations." (Doc. No. 1, Complaint, ¶¶ 5-13.)  These allegations are replete with contentions that are simply not true, but which have never been retracted or amended by Nautimill.  For example, in Paragraph 5, Nautimill alleges that "*under the terms of the sale*, the vessel was to be refitted with two Caterpillar 3412 engines of 1,000 horse power each…;" yet, not one of the sale documents executed by Nautimill and Legacy Marine (even the Vessel Purchase Agreement prepared by Nautimill's agent) mentions or refers to the horsepower of the engines installed on the Vessel.  Paragraph 6 states that Legacy Marine charged Nautimill for the cost of transporting the Vessel from Houston to Uruguay aboard the M/V GDANSK – in truth, Nautimill's agent, Hasselman and/or IMSE, arranged and charged Nautimill for the cost of transporting the Vessel aboard the M/V GDANSK.  Paragraph 8 alleges that the "serial number identifying each engine did not correspond with the type of engine provided," but neglects to mention that the serial numbers referenced were taken from engine identification plates prepared by Hasselman—at Nautimill's direction—with the knowledge that the serial numbers used did not match those installed on the Vessel.  Paragraph 9 erroneously states the horsepower results of a test carried out by Frank & Jimmie's Propeller as 625 (Port engine) and 540 (Starboard engine), when, in fact, "625 horsepower" and "540 horsepower" are the ratings taken from the adulterated engine identification plates prepared by Hasselman and not the results of the test conducted by Frank & Jimmie's.  Paragraph 11 alleges that "different size propellers were fitted [to the Vessel] in order to disguise the different and low horsepower capacity of the engines, and to allow the

vessel to navigate in a straight line" – besides being absurd, this allegation has been flatly refuted by Nautimill's own experts.    Paragraph 12 alleges that Legacy Marine "failed" to provide certain drawings and plans for the Vessel – it is undisputed that the parties never entered into any contract related to these plans, yet this allegation, like each of the others above, has never been retracted or amended.    The underlying facts established through discovery are set forth below.

> 1.) The Vessel.

In the fall of 2013, Nautimill contacted Hasselman at IMSE to request that Hasselman search for a pushboat for Nautimill to purchase.    It is undisputed that Hasselman and/or IMSE was, at all times material hereto, acting as the agent of Nautimill.    Hasselman testified in his deposition that Ruben Varela, the president of Nautimill, specified in his instructions to Hasselman that Nautimill required a 2,000 horsepower vessel "that had to be new construction."    Hasselman did not provide these, or any other, specifications to Legacy Marine.

R&R Boats had begun constructing the Vessel in late 2012 from a partially complete hull that it purchased in August of 2012, which had never been put into service.    R&R's work on the Vessel included completion of hull construction, installation of steel, rudders, rudder tubes, construction of living quarters, and installation of all propulsion equipment, and all other systems (including but not limited to exhaust, navigation, fire and HVAC) on the Vessel.    The propulsion equipment installed on the Vessel included completely reconditioned and rebuilt Caterpillar 3412 C DITA main engines rated at 800 horsepower each with parts obtained from a local Caterpillar dealer.

In addition to reconditioning and installing the main engines, R&R installed a new propeller and a reconditioned propeller on the Vessel.    The reconditioned propeller was obtained from R&R's existing stock and was reconditioned and adjusted to the proper size by a propeller

shop in Houma, Louisiana.  R&R also installed reconditioned Twin Disc marine gears in the Vessel.  Hasselman had viewed the Vessel during various stages of construction when he visited Legacy Marine for other projects.

On November 14, 2013, Hasselman sent photographs of the Vessel to Nautimill, along with a list of specifications that he had prepared.  Hasselman advised Nautimill that the Vessel was a "BRAND NEW TUG" that measured "58' X 20' X 6,'" equipped with "Engines Twin Cat 3412 rated 1,000 Hp each."  Hasselman has admitted he has no record of having received the horsepower rating for the engines installed on the Vessel, or any of the other Vessel specifications from Legacy Marine.  The Vessel specifications listed by Hasselman are very different from the actual specifications advertised by Legacy Marine's affiliate, R&R Boats, which were relayed by representatives of Legacy Marine to Hasselman.

In early 2014, R&R Boats listed the Vessel on its internet website.  The specifications listed by R&R included the following:  "MAIN ENGINES 3412 C DITA," "MAXIMUM BHP 800 HP @ 1,800," "NEW BUILD 2013" and "SPECIFICATIONS BELIEVED TO BE CORRECT BUT NOT GUARANTEED."  R&R Boats also advertised the Vessel in a marine trade publication, Boats & Harbors Magazine, in March and April of 2014.  The Boats and Harbors Magazine advertisement included the following information:  "1600 HP PUSHBOAT, 2013 (New Build) Pushboat," "Main Engines (2) Cat 3412 C DITA."

2.) The Inspection.

On February 13, 2014, Hasselman contacted Nautimill to advise Varela that two Uruguayan Navy officers were in Bourg, Louisiana to inspect another vessel that Hasselman was purchasing from R&R for another customer in Uruguay.  Hasselman testified that Varela responded with a request that these Uruguayan Navy officers also perform an inspection of the

-12-

Vessel.

Nautimill now seeks to minimize the significance of by this inspection by re-characterizing it as a simple "visit." This position is belied by the testimony of Hasselman, who testified that it was the inspectors' job to verify the condition and capacity of the main engines and other propulsion equipment installed on the Vessel. In addition, Hasselman confirmed that the inspection and sea trial conducted by the Uruguayan Navy officers included an inspection of the engine room and all machinery spaces, photographs of the Vessel, a checklist of questions, a "crash test" and that "whatever the officers from the Uruguayan Coast Guard requested, [Legacy Marine] did" during the inspection and sea trial.

Although they had every opportunity to conduct whatever inspection or testing they desired to confirm that the Vessel met Nautimill's alleged needs, neither the inspectors, Hasselman nor Nautimill, itself, undertook any effort to verify the specifications reported by Hasselman to Nautimill on November 14, 2013. Significantly, one of Nautimill's representatives specifically questioned Mr. Hasselman about the "newness" of the main engines in an email sent two weeks prior to consummation of the sale of the Vessel: "David: our spare surveyor told us the engines 3412 are old. They are not made since 1990. It's true?" Neither Nautimill nor Mr. Hasselman has ever located or produced any email sent in response to this question posed to Mr. Hasselman. Moreover, Captain Jorge Perez Castro, one of the Navy officers who conducted the inspection on February 14, 2014, testified that he would have discovered all of the conditions Nautimill now complains of if he had performed a "routine" inspection of the Vessel. Captain Castro's recounting and description of the inspection that he performed is drastically different from that of Hasselman. Based on Hasselman's unverified specifications and the inadequate inspection performed by the Uruguayan Navy officers, Nautimill decided to purchase the Vessel.

3.) The Purchase.

Legacy Marine and Nautimill executed a "Vessel Purchase Agreement," dated effective March 25, 2014.   The Vessel Purchase Agreement contains no reference whatsoever to the age or horsepower rating of the main engines or any other equipment installed on the Vessel.   However, the Vessel Purchase Agreement does state:

> The vessel(s) and all her tackle, apparel, gear, machinery, equipment and furnishings are sold AS IS, WHERE IS, without warranties of merchantability or fitness for any particular use, but the SELLER hereby warrants and represents that said vessel (s) and her accessories are free and clear of all liens mortgages, claims and encumbrances of any kind and description whatsoever and warrants that the SELLER has a good and clean title hereto.

After making several changes requested by Hasselman and Nautimill, Legacy Marine executed a final Vessel Bill of Sale on April 28, 2014.   The Bill of Sale, like the Vessel Purchase Agreement, contains no representations or warranties related to the horsepower or condition of the main engines or related propulsion equipment.   The Bill of Sale did add certain limited warranties that relate to various manufacturers' warranties on equipment, and a one-year, restricted warranty on construction and workmanship of the Vessel's hull.   However, the statement that the sale was "AS IS, WHERE IS" together with the express exclusion of the warranties of "merchantability" and "fitness for any particular use" stated in the Vessel Purchase Agreement remained undisturbed and have never been varied, deleted or amended by any subsequent agreement between Legacy Marine and Nautimill.

Legacy Marine then sailed the Vessel to Houston where it was loaded by crane aboard the M/V GDANSK for transport to Uruguay.   During that loading process, which was overseen by Hasselman, the Vessel was dropped from a lift into the water below.   The Vessel was successfully loaded onto the M/V GDANSK the following day and arrived in Montevideo, Uruguay on or about

May 25, 2014.

### 4.) Nautimill Complains 7 Months Later.

The Vessel entered pushboat service as the "DOSCAPI-S" on July 14, 2014, yet Legacy Marine received no complaint from Hasselman or Nautimill concerning the Vessel until January of 2015. On January 23, 2015—more than seven months after the Vessel had arrived in Uruguay—Hasselman first advised Legacy Marine that Nautimill had complained that the main engines installed on the Vessel were "USED", and that the main engines were "NOT 1,000" horsepower.

Representatives of Legacy Marine met with representatives of Nautimill at Legacy Marine's office on or about January 24, 2015, at which time Legacy Marine explained that the main engines were 800 horsepower each, that the engines and certain other equipment had been reconditioned by R&R Boats and that this information had been disclosed to Hasselman and/or the inspectors sent by Nautimill to inspect and sea trial the Vessel. Legacy Marine also provided Nautimill's representatives with a copy of the Boats & Harbors magazine advertisement for the Vessel. After the meeting, Legacy Marine did not hear from Nautimill again until it was served with the Complaint filed in this lawsuit.

### 5.) Nautimill's and Hasselman's Claims are Without Merit.

Legacy Marine denies making any misrepresentations with regard to the Vessel. That being said, all conditions of the Vessel that are the subject of Nautimill's Complaint could have easily been discovered if Nautimill had undertaken a reasonable inspection at any time. Moreover, because Hasselman—not Legacy Marine—was the source of the misrepresentations concerning the Vessel that are the basis of Nautimill's Complaint, Legacy Marine filed a third-party demand against Hasselman and IMSE for contribution and indemnity, as well as damages,

arising from Hasselman's misrepresentations concerning the Vessel to Nautimill. Notably, Hasselman's misrepresentations did not cease with the sale of the Vessel. It is undisputed that Hasselman executed an affidavit in connection with that certain matter captioned: *Operaciones Tecnicas Marinas, S.A.S. v. Diversified Marine Services, LLC, et al.*, United States District Court for the Eastern District of Louisiana, Ca. No. 12-1979, which contained statements pertaining to Legacy Marine's principal, Robert Boudreaux, and its affiliated companies that Hasselman has admitted are untrue.

With respect to damages, Nautimill seeks to recover the cost of replacing the engines installed by Legacy Marine with new engines. However, the engines proposed by Nautimill's experts are not equivalent to the 3412 C DITA engines that Nautimill agreed to purchase when it bought the Vessel. Although its Complaint includes no such cause of action or claim for damages, Nautimill has indicated that it intends to seek lost profits that it allegedly would have made if the Vessel had 2,000 horsepower. Even if the claim for lost profits had been properly pleaded and was to be considered by this Court, Nautimill has no evidence besides its own self-serving testimony to establish that it could have generated the alleged lost profits, which must be proven with particularity under Louisiana law.

Finally, Hasselman's and IMSE's counterclaim against Legacy Marine is baseless for all of the reasons stated in Legacy Marine's pending motions for summary judgment. The evidence obtained through discovery demonstrates that Hasselman and IMSE have already been paid more in commissions than the $100,000.000 that Nautimill had agreed to pay. Moreover, Legacy Marine owed no duty to Hasselman or IMSE to pay the commissions that Nautimill allegedly failed to pay. Any remedy that Hasselman and/or IMSE may have for damages arising out of the commission is against Nautimill—the party who contracted to pay the commission to Hasselman

and/or IMSE.   Similarly, Legacy Marine owed no duty to Hasselman or IMSE that could serve as the basis for Hassleman's and IMSE claims for damages allegedly sustained to the hull of the Vessel (owned by Nautimill, not Hasselman or IMSE) during transport to Houston, Texas.

### c. By Hasselman and IMSE:

Nautimill, a long time client of Hasselman IMSE was in need of a 2000 horsepower towboat.

Hasselman, while in contact with Robert Boudreaux, one of the principals at Legacy Marine, advised Boudreaux of this need. Boudreaux offered the Legacy Server to Hasselman for Hasselman's client.

After the Legacy Server was launched and while Hasselan's client, Nautimill was considering purchasing the vessel, two officers of the Uruguayan Navy conducted a cursory look over of the boat which included a very brief "sea trial" One of these officers, Jorge Perez Castro, testified at his deposition taken on June 7, 2016, that while this "sea trial" was being conducted, he was on the bridge of the Legacy Server and heard Boudreaux confirm that the vessel was indeed a 2000 horsepower push boat. (Which corroborates the testimony of Hasselman, who was also present when this conversation took place.)

After the vessel arrived in Uruguay, it was discovered that while the boat was offered as a "new build", the engines were in fact reconditioned, and, perhaps even more significantly, did not produce anything close to 1000 hp each.

Hasselman's client, Nautimill, because the vessel was unable to perform the work for which it had been purchased, was able to charter the vessel for only half of what a 2000 hp towboat could earn. This caused financial hardship for Nautimill which was then unable to pay IMSE/Hasselman the full amount due of the commission on the sale of that vessel as well as that of another.

IMSC/Hasselman's counterclaim also alleges that Legacy was paid to transport the Legacy Server and a 41 foot vessel, which IMSE had brokered for another of IMSE's clients on their own bottoms Houston. Instead, Legacy had the 41 foot vessel towed "on the hip of" the Legacy Server which resulted in approximately $4000 in damage to the hull of that 41 foot vessel.

7.    **LIST OF UNCONTESTED MATERIAL FACTS:**

1.    In April 2014 Legacy sold to Nautimill a pushboat then named M/V LEGACY SERVER, now renamed as the M/V DOSCAPI S.

2.    The sale of the pushboat was brokered through David Hasselman of IMS&E.

3.    Prior to the sale Legacy represented that the engines of the M/V LEGACY SERVER were Caterpillar 3412 C DITA engines.

4.    Prior to the sale Legacy represented that the engines of the M/V LEGACY SERVER only had sea trial hours.

5.    In February 2014, the main engines had approximately 10 hours of use.

6.    The engines of the M/V LEGACY SERVER were rebuilt in-house by R&R Boats Inc.

7.    Prior to installing the R&R reconditioned engines on the M/V LEGACY SERVER, the engines were not dyno-tested.

8.    To rebuild the engines R&R used Caterpillar engine blocks.

9.    The marine gears on the M/V LEGACY SERVER were reconditioned by RMI Services, Inc.

10.   The port propeller of the M/V LEGACY SERVER is a new propeller, but the starboard propeller is rebuilt.

11.   The port and starboard propellers have different disc area or blade area ratio.

12.   R&R advertised the Legacy Server for sale or charter in the Boats & Harbor magazine as a new build vessel of 1600 HP capacity, with each engine having 800 HP.

13.   Legacy executed a Bill of Sale for the purchase of the Vessel dated April 28, 2014. Prior to this Bill of Sale two other versions were executed, both dated April 2, 2014 but executed on different dates, one was executed on April 2, 2014 and the other one on or after April 4, 2014.

14.   In February 2013 Mr. Boudreaux purchased from Hawthorn a set of used Caterpillar 3412 DITA engines with no warranty.

15.   Mr. Boudreaux represented to Mr. Hasselman's that the Caterpillar 3412 DITA engines he had previously purchased from Hawthorn were "Brand New", "Old Stock", "Not rebuild", "Never put in Service."

16.   Legacy Marine built another vessel, the M/V LEGACY PROVIDER and fitted that vessel with two 1,000 HP engines.

17.   On January 22, 2015 Nautimill's Uruguayan lawyers transmitted an email addressed to IMS&E, R&R, Legacy and Diversified Marine Services, LLC., complaining that the engines of the M/V LEGACY SERVER were different as they each have different horse power, that the engines are not new, that they are not rated at 1,000 HP each, and that the propellers were different.

18.   R&R Boats began constructing the LEGACY SERVER in late 2012 from a partially complete hull that it had purchased in August of 2012, which had never been put into service.

19.   Legacy Marine reconditioned the main engines and other propulsion equipment installed in the Vessel.

20.   Legacy Marine installed a new 68"X58" propeller on the port shaft of the Vessel and a reconditioned 68"X58" propeller on the starboard shaft.

21.   At all times material hereto, Hasselman and IMSE acted as the agent of Nautimill.

22.   Hasselman sent an email to Nautimill, on November 14, 2013 advising that the Vessel was available for purchase and described the Vessel as: "BRAND NEW TUG" that measured "58' X 20' X 6,'" equipped with "Engines Twin Cat 3412 rated 1,000 Hp each."

23.   Caterpillar 3412 C DITA engines have been out of production since 2008.

24.   The Vessel was inspected by the two officers of the Uruguayan Navy, on behalf of Nautimill on or about February 14, 2014.

25.   Legacy Marine and Nautimill executed a "Vessel Purchase Agreement," prepared by David Hasselman, on or about March 25, 2014.

26.  On March 28, 2014, Carlos Schinoni of Nautimill sent an email to Hasselman that stated: "David: our spare surveyor told us the engines 3412 are old.  They are not made since 1990.  It's true?"

27.  Legacy Marine and Nautimill executed a "Protocal of Acceptance and Ready to Ship" on April 4, 2014.

28.  Legacy Marine executed a final United States Coast Guard Bill of Sale on April 28, 2014.

29.  Legacy Marine accepted and made all changes to the Bill of Sale requested by Nautimill and/or Hasselman.

30.  Legacy Marine transported the Vessel from Bourg, Louisiana to Houston, Texas on or about April 9, 2014.

31.  When the Vessel reached Houston, Texas, it was loaded onto the M/V GDANSK for transport to Uruguay.

32.  During the loading of the Vessel onto the M/V GDANSK, the cradle used to lift the Vessel broke and the Vessel fell into the water below.

33.  The Vessel reached Uruguay on or about May 25, 2014.

34.  On June 18, 2014, Hasselman forwarded to Nautimill engine warranty history reports that he had obtained using engine serial numbers provided by Legacy Marine on March 31, 2014.

35.  The Vessel entered service as a pushboat for Nautimill on or about July 13, 2014.

36.  On or about January 23, 2015, Hasselman contacted representatives of Legacy Marine to advise that representatives of Nautimill had requested a meeting to discuss complaints that Nautimill had concerning the Vessel.

37.  Representatives of Legacy Marine met with representatives of Nautimill at Legacy Marine's office on January 24, 2015.



38.  IMSE issued an invoice to Nautimill for the purchase of the Vessel in the sum of $2,200,000.00. ~~which included a $100,000.00 commission that Nautimill paid to IMSE and/or Hasselman.~~

39.  Nautimill built two pushboats in 2013, and installed reconditioned engines on both vessels.

**8.    LIST OF CONTESTED ISSUES OF FACT:**

The following issues of fact are contested:

1.  Whether prior to the sale Legacy represented the M/V LEGACY SERVER to be a 2,000 HP vessel.

2.  Whether prior to the sale Legacy knew what was the actual horsepower of the engines.

3.  Whether the engines of the M/V LEGACY SERVER are indeed of 800 HP each.

4.  What was the actual horse power of the engines installed on the M/V LEGACY SERVER when the vessel was sold to Nautimill.

5.  Whether the engines of the M/V LEGACY SERVER had the same horsepower and were truly twin engines.

6.  Whether the rebuild condition of the engines was apparent from the representations on the R&R website, the ad in the Boats & Harbors magazine, and from the pre-sale inspection carried out by the Uruguayan naval officers.

7.  Whether disclosing the model of the engines as "Cat 3412 C DITA" is sufficient to constitute a disclosure of the fact that the engines were rebuilt.

8.  Whether Legacy's misrepresentations regarding the new condition of the vessel and its concealment of critical information relating to the used propulsion equipment influenced Nautimill's decision to purchase the vessel.

9.  Whether Legacy failed to disclose the true condition of the engines in order to induce Nautimill to purchase the Vessel.

10. Whether Legacy's representations regarding certain conditions of the vessel met Nautimill's requirements, so that there was no need for Mr. Hasselman, IMS&E or Nautimill to provide further specification in writing.

11. Whether in light of the representation by Legacy that the M/V LEGACY SERVER was new, Mr. Hasselman, IMS&E or Nautimill were required to request or obtain written verification of the age, capacity or other condition of the main engines, reduction gears, propellers or related propulsion equipment.

12. Whether when a vessel is represented to be new it is understood all of its components are also new, including the propulsion machinery.

13. Whether it is the custom in the industry to disclose the fact that a new built vessel is fitted with rebuilt components including the engines, reduction gears, propellers or related propulsion equipment.

14. Whether disclosing the make and model of the engines is sufficient disclosure that the engines of the M/V Legacy Server were not new.

15. Whether the visit of the Uruguayan officers aboard the M/V LEGACY SERVER in February 2014 was a formal and complete vessel inspection and sea trial.

16. Whether the used and rebuilt condition of the engines and marine gears was discoverable during the visit by the Uruguayan officers in February 2014.

17. Whether discovering the used or rebuilt condition of the engines or the fact that they were of a different horsepower could be accomplished without difficulty, inconvenience or special skill.

18. Whether a detailed and exhaustive inspection of the engines of the M/V LEGACY SERVER was reasonable in light of the circumstances particular to this case involving a vessel represented to be a newly built vessel.

19. Whether the Bill of Sale and the vessel Purchase Agreement have contradictory terms.

20. Whether the Bill of Sale constitutes the parties' final agreement regarding the terms of the sale of the vessel and the warranty representations from Legacy to Nautimill.

21. Whether the condition of the engines at the time the M/V LEGACY SERVER was sold to Nautimill made the use of the vessel so inconvenient that Nautimill would not have purchased the vessel had it known of the condition.

22. Whether the condition of the M/V LEGACY SERVER as sold prevents Nautimill from engaging the vessel in the marine service for which it was purchased.

23. Whether the vessel has diminished in value due to its reduced power.

24. Whether had Nautimill known of the actual horsepower capacity of the Vessel and that it was not of the 2,000 HP it was represented to be, Nautimill would have nevertheless bought it.

25. Whether Nautimill's limited use of the vessel has resulted in the loss of revenue.

26. The process of reconditioning and rebuilding the main engines was performed by qualified mechanics working at R&R, and commenced with a complete tear down of two Caterpillar 3412 C DITA engines acquired from R&R's stock.

27. Legacy Marine communicated to Hasselman and/or other representatives of Nautimill that the horsepower rating of the Vessel's main engines was 800 horsepower each.

28. The horsepower capacity of the Vessel's main engines at the time of the inspection conducted by Nautimill on February 14, 2014 was 800 horsepower each.

29. Legacy Marine represented to Nautimill and/or its representatives that the main engines and related propulsion equipment installed on the Vessel were

reconditioned.

30. Whether Nautimill, Hasselman and/or IMSE knew that the main engines and related propulsion equipment installed on the Vessel were reconditioned.

31. Whether the serial numbers provided by Legacy Marine to Hasselman on March 31, 2014 were provided by mistake or in response to a specific request made by Hasselman for serial numbers related to different a set of Caterpillar engines.

32. The conditions under which Nautimill operated the Vessel between July and November of 2014, and whether those conditions caused the fouling of the Vessel's turbochargers and aftercoolers.

33. The amount of commission that Nautimill contracted to pay Hasselman and/or IMSE as a result of its purchase of the Vessel.

34. The amount of commission that Nautimill actually paid Hasselman and/or IMSE as a result of its purchase of the Vessel.

35. Whether the Vessel sustained any damage when it was sailed from Bourg, Louisiana to Houston, Texas.

36. Whether the Vessel sustained any damage when it was dropped while being loaded onto the M/V GDANSK.

37. Whether the difference in the disc area ratio between the port and starboard propeller blades causes any operational difficulties or problems for the Vessel.

38. Did Robert Boudreaux and/or Jessica Boudreaux misrepresent the condition of it horsepower rating of the engines propelling the Legacy Server?

39. Was Legacy Marine negligent in transporting and towing the 41 foot vessel on the hip of the Legacy Server?

40. How much damage was caused to the 41 foot vessel as a result of the alleged negligence of Legacy Marine?

41. Did IMSE/Hasselman sustain any monetary loss as a result of the misrepresentation of the horsepower and condition of the Legacy Server's engines.

42. Is Legacy Marine liable to IMSE/Hasselman for the loss of his commissions due to the misrepresentation of the condition and horsepower of the engines in the Legacy Server?

43. Is Legacy Marine liable to IMSE/Hasselman for the damage to the vessel towed on the hip of the Legacy Server

44.    Whether Nautimill purchase the M/V LEGACY SERVER with the understanding that it was a new vessel fitted with Caterpillar twin engines of a combined 2,000 HP capacity (1,000 HP each).

45.    Whether Nautimill intended to use the vessel in a project in Uruguay with Constructora OAS, S.A. ("OAS") in the Regasificadora Gas Sayago project for which Nautimill expected to earn $8,000 per day for one year of service.

46.    Whether the M/V LEGACY SERVER was a new vessel when it was sold to Nautimill.

47.    Whether the engines of the M/V LEGACY SERVER were certified or commissioned by Caterpillar after they were rebuilt by R&R.

48.    Whether to rebuild the engines R&R used an assortment of unidentified parts of unknown sourcing.

49.    Whether only a few of the component parts of the engines rebuilt by R&R were purchased new. The rest of the parts came from R&R's own inventory.

50.    Whether the engines and marine gears of the M/V LEGACY SERVER were under warranty when the vessel was sold to Nautimill.

51.    Whether Legacy knew that there was no warranty on the engines and marine gears of the M/V LEGACY SERVER when it was sold to Nautimill.

52.    Whether Legacy disclosed to Nautimill prior to the sale that the engines and marine gears were rebuilt in-house, and that they were not under warranty.

53.    Whether the port engine of the M/V LEGACY SERVER does not have a serial number.

54.    Whether Legacy disclosed to Nautimill prior to the sale that the starboard propeller was rebuilt.

55.    Whether Legacy disclosed to Nautimill prior to the sale that the propellers disc area ration was different.

56.    Whether the Boats & Harbor magazine advertisement expressly state that the engines are rebuilt engines.

57.    Whether the R&R website specify that the engines of the M/V LEGACY SERVER are rebuilt engines.

58.    Whether Hasselman, ISME and Nautimill were aware of the Boats & Harbor

magazine advertisement prior to agreeing to purchase the Vessel.

59.   Whether Hasselman, ISME and Nautimill were aware of the listing of the M/V
      LEGACY SERVER on R&R's company website prior to agreeing to purchase the
      Vessel.

60.   Whether Nautimill first learned of the advertisement in the Boats & Harbor
      magazine sometime in 2015 when Nautimill's Uruguayan lawyers visited Legacy's
      office in Louisiana long after the M/V LEGACY SERVER had already been
      delivered in Uruguay.

61.   Whether sometime in February 2014 two Uruguayan naval officers, Mr. Jorge
      Perez and Eduardo Costa visited aboard the M/V LEGACY SERVER along with
      Mr. Hasselman.

62.   Whether during their visit aboard the M/V LEGACY SERVER the Uruguayan
      officers visited the engine room and rode along on the vessel as it was taken on a
      short trip.

63.   Whether Legacy represented in the Bill of Sale that the equipment was "warranted
      by the various manufacturers" despite knowing that there was no warranty on the
      propulsion equipment.

64.   Whether when the mechanic for the local Caterpillar representative inspected the
      engines in Uruguay he did not recognize them and could not tell what kind of
      engines they were.

65.   Whether at the time Finning CAT inspected the engines in Uruguay, the engines
      had 300 hours of operation.

66.   Whether Frank & Jimmies's was retained in order to test and determine the true
      horsepower capacity of the engines.

67.   Whether the test performed by Frank & Jimmie's is the most accurate means of
      determining an engine's true horsepower.

68.   Whether as a result of the reduced horsepower capacity of the engines, Nautimil
      has been limited in the service for which the vessel can be used.

69.   Whether had Nautimill known of the true condition and capacity of the engines it
      would not have purchased the vessel.

70.   Whether Legacy supplied to Mr. Hasselman the wrong serial numbers for the
      engines of the M/V LEGACY SERVER.

71.   Whether Hasselman or Nautimill obtained anything in writing to verify the Vessel
      specifications reported by Hasselman to Nautimill on November 14, 2013.

72.     Whether in late January or early February of 2014, R&R Boats advertised the Vessel on the company website.   The advertisement included the make and model of the main engines and stated that the engines were each rated 800 horsepower at 1,800 rpms.

73.     Whether in March and April of 2014, R&R Boats advertised the Vessel for sale or charter in Boats & Harbors Magazine.   The advertisement included the make and model of the main engines and stated that the engines were rated 1,600 horsepower (combined).

74.     Whether Hasselman was aware of R&R Boats' website and Boats & Harbors Magazine.

75.     Whether Caterpillar 3412 C DITA engines have never been available in a marine configuration capable of producing 1,000 horsepower.

76.     Whether Capt. Roy Pena piloted the Vessel during the sea trial conducted on February 14, 2014.

77.     Whether Hasselman never provided any response to Mr. Schinoni's email dated March 28, 2014.

78.     Whether at the direction of Nautimill, Hasselman prepared engine identification plates using serial numbers that Nautimill knew did not correspond to the main engines installed on the Vessel.

79.     Whether in order to pass inspection and become "flagged" to operate in Uruguay, Nautimill knowingly installed adulterated engine identification plates prepared by Hasselman on the main engines of the Vessel in September of 2014.

80.     Whether the turbo chargers and aftercoolers of the main engines installed on the Vessel were not cleaned prior to the F&J test.

81.     Whether prior to the January 24, 2015 meeting, Nautimill made no effort to contact any representatives of Legacy Marine to discuss any problems or issues it had with the Vessel.

82.     Whether Nautimill has never entered into any contract with any party for the hire or charter of a 2,000 horsepower vessel.

83.     Whether Nautimill had an agreement to supply a 2,000 HP vessel to OAS.

84.     Whether Nautimill's Complaint, does not include any claim for consequential damages.

85.     Whether once the Vessel was in Uruguay, the local Caterpillar representative, Finning CAT inspected the engines on September 1, 2014.

86.     Whether Finning CAT found that the turbo charges and aftercoolers needed to be chemically cleaned.

87.     Whether on November 21, 2014 Nautimill retained the services of Frank & Jimmie's Propeller, to determine the shaft rpm, torque and horsepower output of the installed engines.

88.     Whether Frank & Jimmie's Propellers performed a "True Torque test" of the engines.

89.     Whether a representative from a local Caterpillar dealer in Uruguay, Finning CAT, inspected the Vessel's main engines and issued a report dated October 4, 2014.

90.     Whether Finning CAT's report stated that the turbo chargers and aftercoolers of the main engines installed on the Vessel needed to be "chemically cleaned" before they were tested.

91.     Whether the results of the strain gauge test conducted by the F&J technician indicated a maximum of 595 horsepower on the port engine and a maximum of 614 horsepower on the starboard engine on November 21, 2014.

92.     In March 2014 Mr. Boudreaux offered to sell to Mr. Hasselman for Mr. Hasselman's Nigerian client the Caterpillar 3412 DITA engines previously purchased from Hawthorn.

93.     Whether upon Mr. Hasselman discovering that the Caterpillar 3412 DITA engines that Mr. Boudreaux offered to sell for Mr. Hasselman's Nigerian client were not new, Mr. Hasselman refused to go forward with the transaction.

94.     Whether by cancelling the purchase of these engines Hasselman lost the opportunity to earn the commission he stood to obtain from the sale of the engines to his Nigerian customer.

95.     Whether Hasselman and/or IMSE fraudulently and/or negligently misrepresented any condition of the Vessel and/or its propulsion equipment to Nautimill.

96.     The quantum of damages sustained by Legacy Marine as a result of Hasselman's and/or IMSE's fraudulent and/or negligent actions and/or omissions.

97.     Whether Varela requested that Hasselman arrange for an inspection of the Vessel by two Uruguayan Navy officers who were in Louisiana for the purpose of inspecting another vessel that would be operated in Uruguay.

98.    Whether the inspection by the Uruguayan officers included inspection of all machinery spaces and a sea trial.

99.    Whether Legacy Marine and Nautimill negotiate or execute any agreement for the provision of plans for the Vessel to Nautimill.

100.    Whether prior to the sell Legacy or R&R performed a proper test to determine the engines' actual horsepower.

101.    Whether a "dock push" is an accurate means of determining a vessel's horsepower.

## 9.    LIST OF CONTESTED ISSUES OF LAW:

The following issues of law are contested:

1.    Whether Legacy fraudulently misrepresented the condition and capacity of the vessel under La. C.C. Art. 1953.

2.    Whether Legacy negligently misrepresented the condition and capacity of the vessel.

3.    Whether Legacy's misrepresentations and suppression of the true condition and capacity of the vessel induced Nautimill to purchase it.

4.    Whether Legacy's misrepresentations and suppression of the true condition and capacity of the vessel constitute fraud under La. C.C. Art. 1953.

5.    Whether Nautimill was relieved from engaging in an exhaustive and detailed inspection of the vessel in light of the representations made by Legacy.

6.    Whether the general overview conducted by the Uruguayan officers in February of 2014 satisfied the due diligence required of Nautimill under the circumstances.

7.    Whether Nautimill's consent was vitiated as a result of the misrepresentations made by Legacy.

8.    Whether at the time the M/V LEGACY SERVER was purchased by Nautimill    it contained a redhibitory defect pursuant to La. C.C. Art. 2520.

9.    Whether Legacy breached the warranty against redhibitory defects.

10.    Whether the M/V LEGACY SERVER's lower horsepower constitutes a defect rendering its use by Nautimill so inconvenient that it must be presumed that Nautimill would not have purchased the Vessel had it known of it, and therefore constitutes a redhibitory defect.

11.    Whether the condition of the propellers having a different disc area ratio, with one propeller being reconditioned, constitutes a redhibitory defect.

12.    Whether Legacy breached the warranty of fitness for the intended use.

13.    Whether the "AS IS, WHERE IS" wording in the Vessel Purchase Agreement is enforceable.

14.    Whether under the particular circumstances of this case the "AS IS, WHERE IS" language constitutes a waiver of the warranty implied by law in every contract for the sale of goods that the seller would deliver to the buyer a thing that is reasonably fit for its intended use.

15.    Whether Nautimill waived any warranties of quality or fitness with respect to the M/V LEGACY SERVER.

16.    Whether the language of the Bill of Sale regarding the warranties supplied with the vessel are enforceable.

17.    Whether Nautimill was induced to signing the Vessel Purchase Agreement under false and fraudulent misrepresentations.

18.    Whether Legacy is in breach of contract.

19.    Whether Nautimill can meet the burden of proof applicable to its claims for fraudulent misrepresentation, negligent misrepresentation, redhibition, breach of the warranty for ordinary use and/or breach of contract against Legacy Marine.

20.    Whether, and only in the event that Nautimill meets its burden of proving that Legacy Marine made fraudulent misrepresentations, Louisiana Civil Code article 1954 bars any recovery by Nautimill for fraud.

21.    Whether, and only in the event Nautimill meets its burden of proving that Legacy Marine made negligent misrepresentations, Nautimill justifiably relied on any such misrepresentations.

22.    Whether any condition of the main engines and/or related propulsion equipment installed in the Vessel constitutes a "defect" under Louisiana redhibition law.

23.    Whether Nautimill's use of the Vessel bars its claims under Louisiana redhibition law and/or the law applicable to claims for fraudulent and/or negligent misrepresentation.

24.    Whether the inspection performed by Nautimill of the Vessel constitutes a reasonable inspection under Louisiana law applicable to claims for fraudulent misrepresentation, negligent misrepresentation and/or redhibition.

25. Whether the terms of the Vessel Purchase Agreement waived the warranty of fitness for ordinary use and/or intended use.

26. Whether the Bill of Sale modified Nautimill's waiver of the warranty of fitness for ordinary use and/or intended use.

27. Whether Legacy Marine breached any contract with Nautimill.

28. The quantum of damages, if any, sustained by Nautimill attributable to the alleged conduct and/or omissions of Legacy Marine and whether Nautimill can establish legal entitlement to such damages.

29. Whether Nautimill is entitled to consequential damages in the form of lost profits.

30. Whether Nautimill can prove, with particularity as required by Louisiana law, consequential damages in the form of lost profits.

31. Whether Legacy Marine is entitled to a credit for Nautimill's use of the Vessel for nearly two (2) years.

32. Whether Legacy Marine is entitled to indemnity and contribution from Hasselman and/or IMSE in the event it is found liable to Nautimill.

33. Whether Legacy Marine is entitled to damages from Hasselman and/or IMSE for the fraudulent and/or negligent misrepresentations made by Hasselman and/or IMSE, and the quantum of such damages.

34. Whether Hasselman and/or IMSE have any right to recover from Legacy Marine a commission that Nautimill agreed to pay.

35. Whether Legacy Marine is the legal cause of Nautimill's breach of its contract to pay a commission to Hasselman and/or IMSE.

36. Whether Hasselman and/or IMSE have any right to recover damages from Legacy Marine arising from the alleged scuff marks on the Vessel that occurred during its transport from Bourg, Louisiana to Houston, Texas.


**10.    DESCRIPTION OF EXHIBITS TO BE INTRODUCED AT TRIAL:**

**By Nautimill without objection**:

1. Email chain between Varela and Hasselman dated 11/13/13 and 11/14/13;

2. Email from Hasselman to Varela dated 11/14/13;

3.  Email from Hasselman to Varela dated 11/14/13 sending photos and the specifications of the new tug boat;

4.  Email from Hasselman to Varela dated 2/4/14;

5.  Email chain between Hasselman and Varela dated 2/13/14;

6.  Email from Hasselman to R&R dated 2/24/14 (LMT 31);

7.  Email chain between Hasselman and Mrs. Boudreaux dated 2/24/14 and 2/25/14 (LMT 35-36);

8.  Email from Hasselman to Mrs. Boudreaux dated 2/26/14 (LMT 41);

9.  Email from Robert Boudreaux to Hasselman dated 3/17/14 (LMT 49);

10. Email from Hasselman to Mrs. Boudreaux dated 3/24/14 (LMT 57);

11. Text messages between Hasselman and Mrs. Boudreaux dated 3/25/14 regarding down payment for the Legacy Server;

12. Email chain between Hasselman and Mrs. Boudreaux dated 3/28/14 (LMT 91-92);

13. Email from Mrs. Boudreaux to Hasselman dated 3/31/14 (LMT 198-199);

14. Email from Mrs. Boudreaux to Hasselman dated 4/4/14 (LMT 118 -121);

15. Email chain between Hasselman and Mrs. Boudreaux dated 4/4/14 (LMT 126);

16. Email chain between Hasselman and Mrs. Boudreaux dated 5/8/14 (LMT 151-152);

17. Email chain between Robert Boudreaux, Hasselman, Daniel Burgos and Martin Etcheverry dated 1/22/15 and 1/23/15 (LMT 159-168);

18. Email from Hasselman to Robert Boudreaux dated 2/24/14 (LMT 180);

19. Email from Hasselman to Mrs. Boudreaux dated 2/26/14 (LMT 181);

20. Email from Hasselman to Mr. and Mrs. Boudreaux dated 3/17/14 (LMT 182);

21. Email chain between Mrs. Boudreaux and Hasselman dated 3/20/14 (LMT 183-184);

22. Email chain between Hasselman and Mrs. Boudreaux dated 3/21/14 (LMT 186-187);

23. Email chain between Mrs. Boudreaux and Hasselman dated 3/21/14 (LMT 188-190);

24. Email chain between Mrs. Boudreaux and Hasselman dated 3/24/14 (LMT 195-197);

25. Email chain between Hasselman and Varela dated 3/28/14;

26. Email chain between Hasselman and Varela dated 5/5/14;

27. Email chain between Hasselman and Varela dated 6/17/14 and 6/18/14;

28. Email chain between Hasselman and Varela dated 9/1/14, 9/3/14 and 9/4/14;

29. Email chain between Hasselman and Varela dated 9/5/14;

30. Email chain between Hasselman and Varela dated 9/11/14;

31. Portions of the R&R Boats website referencing the M/V LEGACY SERVER;

32. Boats & Harbors letter dated April 4, 2014 to R&R Pushboats with advertisement for the M/V LEGACY SERVER;

33. International Marine Sales & Export, LLC Invoice No. NA 14-009DPP dated February 25, 2014;

34. International Marine Sales and Export, LLC Vessel Purchase Agreement;

35. Bill of Sale dated April 2, 2014 (LMT 119-120);

36. Bill of Sale dated April 2, 2014 (LMT 135-136);

37. Bill of Sale dated April 28, 2014;

38. Photos of the M/V Legacy Server;

39. "CONSTANCIA PREMO No. 099/15" from the "Prefecto del Puerto de Montevideo" (Authority of the Port of Montevideo);

40. Astillero Montevideo's Invoice No. 558 dated August 13, 2015;

41. Dufour, Laskay & Strouse, Inc. Invoice No. 17734 dated August 25, 2015;

42. Plan Electrico SRL's Invoice No. 759 dated September 28, 2015;

43. Kalil S.A.'s Invoice No. 15117 dated January 22, 2015;

44. Plan Electrico SRL's Receipt No. 305 dated January 15, 2015 and Invoice No. 669;

45. Turbopower Invoice No. 015174 dated May 6, 2015;

46. Invoice #484674-JH and #483205-JH by Frank & Jimmie's Propeller;

47. Louisiana CAT email dated August 11, 2015;

48. Legacy Marine's Responses to Nautimill's First Set of request for Admission;

49. Legacy Marine's Responses to Nautimill's First Set of Interrogatories and Request for Production of Documents;

50. Legacy Marine's Responses to Nautimill's Second Set of request for Admission;

51. Legacy Marine's Responses to Nautimill's Second Set of Interrogatories and Request for Production of Documents;

52. Photographs and attachments to DLS report dated April 7, 2016;

53. Website Vision Maritima article regarding the Christening of the DOSCAPI S (with English translation);

54. Documents obtained from Hawthorn via subpoena;

55. Specification sheet for M/V LEGACY SERVER;

56. Specification sheet for M/V LEGACY PROVIDER;

**By Nautimill, with objection by Legacy**

1. Service Report (Informe de Servicio) by Finning CAT distributor in Uruguay dated April 10, 2014 (with English translation) – Legacy Marine objects to the admissibility of this exhibit on the grounds of hearsay;

2. Frank & Jimmie's Propeller True Torque Test report on M/V DOSCAPI S (Ex M/V LEGACY SERVER) with certification – Legacy Marine objects to the admissibility of this exhibit on the grounds of hearsay;

3. Contract with OAS – Legacy Marine objects on the grounds of hearsay and relevancy;

4. Invoices for Services to OAS – Legacy Marine objects to the admissibility of this exhibit on the grounds of hearsay and relevancy;

5. Attachments to Wingate Marine, LLC report dated April 7, 2016 – Legacy Marine objects to the admissibility of this exhibit on the grounds of hearsay and relevancy;

6. Computation of Costs by Capt. Maran – Legacy Marine objects to the admissibility of this exhibit on the grounds of hearsay;

7. RPM Measurements taken of the engines by Capt. Maran (English and Spanish) – Legacy Marine objects to the admissibility of this exhibit on the grounds of hearsay;

**By Legacy Marine without objection:**

1. Agreement (Boat Hull #1) (LMT 213-217).

2. Specification Sheets for LEGACY PROVIDER and LEGACY SERVER (LMT 218-220).

3. Advertisement for LEGACY SERVER placed in Boats & Harbors magazine, with letter from Boats & Harbors Magazine.

4. Internet advertisement screenshots from R&R Boats's website.

5. Vessel Purchase Agreement, dated March 25, 2014 (LMT 105-107).

6. Protocol of Acceptance and Ready of Ship, dated April 4, 2014 (LMT 137-138).

7. Photographs of the LEGACY SERVER produced in discovery.

8. Legacy Marine Incident report, dated April 12, 2014, prepared by Roy Pena (LMT 221-222).

9. Final Bill of Sale, dated April 28, 2014 (LMT 2-3).

10. Bills of Sale, dated April 2, 2014 (LMT 118-120) and (LMT 135-136) and undated page 1 (LMT 145-148).

11. The following email communications between representatives of Legacy Marine and representatives of Nautimill, S.A. ("Nautimill"), with any attachments thereto:

    A. Emails dated January 22, 2015 (LMT 157-158).

    B. Emails dated January 23, 2015 (LMT 159-160).

    C. Undated letter from Robert Boudreaux to Nautimill representatives.

12. The following email communications between representatives of Legacy Marine and David Hasselman ("Hasselman") and/or representatives of International Marine Sales & Export, LLC ("IMSE"), with any attachments thereto:

    A. Email, dated February 24, 2014 from Hasselman to R&R Boats (LMT 31);

   B. Email, dated February 24, 2014 from Hasselman to R&R Boats (LMT 32);

   C. Email exchange, dated March 21 and 24, 2014, between Hasselman and Jessica Boudreaux with Hawthorne CAT attachment (LMT 195-197);

   D. Email exchange, dated April 4, 2014, between Hasselman and Jessica Boudreaux (LMT 127-128).

13. The following email communications between representatives of Nautimill and Hasselman and/or representatives of IMSE with any attachments thereto:

   A. Email, dated November 14, 2013, from Hasselman to Nautimill;

   B. Email, dated February 13, 2014, from Hasselman to Nautimill;

   C. Email exchange, dated February 13, 2014, between Hasselman and Nautimill;

   D. Email, dated February 17, 2014, from Hasselman to Nautimill;

   E. Email, dated February 25, 2014, from Hasselman to Nautimill;

   F. Email exchange, dated March 27 and 28, 2014, between Hasselman and Nautimill (N 52-53

   G. Email dated March 28, 2014 from Carlos Schinoni to Hasselman (N 1);

   H. Email exchange, dated May 5, 2014, between Hasselman and Nautimill (N 88-89);

   I. Email exchange, dated June 17 and 18, 2014, between Hasselman and Nautimill (N 92-99);

   J. Email exchange, dated September 1 and 3, 2014, between Hasselman and Nautimill (N 105-106)

   K. Email from Hasselman to Nautimill, dated September 4, 2014;

   L. Email exchange, dated September 4, 2014, between Hasselman and Nautimill;

   M. Email exchange, dated September 5, 2014, between Hasselman and Nautimill.

14. Nautimill's written responses to First Set of Discovery Requests.

15. Nautimill's amended written responses to First Set of Discovery Requests.

16. Nautimill's 2nd amended written responses to First Set of Discovery Requests.

17.    Nautimill's responses to Second Set of Discovery Requests.

18.    Hasselman's and/or IMSE's written responses to written discovery.

19.    Force Power Systems invoices produced by Legacy Marine in discovery (LMT 172-178).

20.    RMI Services, Inc. invoice, dated March 27, 2013 (LMT 169).

21.    Byrne, Rice & Turner invoice, dated June 21, 2013 (LMT 170).

22.    Kelps & Will Prop Shop, LLC invoice, dated March 4, 2013 (LMT 171).

23.    Turbopower invoice, dated May 6, 2015 (Ili email 5-2-2016).

24.    Affidavit of David Hasselman, dated July 20, 2015, filed in that certain matter captioned:  *Operaciones Tecnicas Marinas, S.A.S. v. Diversified Marine Services, LLC, et al.*, United States District Court for the Eastern District of Louisiana, Ca. No. 12-1979.

25.    All documents produced by Fowler, Rodriguez in response to subpoena *duces tecum* (FR Subpoena Response 1-55).

26.    All invoices issued by IMSE to Nautimill in connection with the purchase and sale of the LEGACY SERVER, including but not limited to Invoice # NA 14-009DPP in the sum of $2,200,000.00.

27.    Letter from Robert Boudreaux to Nautimill representative enclosing propeller quote and Bill of Sale (LMT 10).

28.    Kelps & Will Prop Shop, LLC propeller quote, dated February 2, 2015 (LMT 11).

29.    "Libro de Maquinas" (Engine Logbook) from July 14, 2014 through September 1, 2015 in 3 volumes.

30.    "Diario de Navegacion para Buques de Cabotaje" (Navigation Journal for Vessels in Cabotage) from July 14, 2014 through April 22, 2015 in 1 volume.

31.    Any documents to be produced by David Hasselman and/or International Sales & Export, LLC in response to Magistrate North's Order, dated June 21, 2016.


**By Hasselman and IMSE with objection by Legacy:**

1.  Photos of the Legacy Marine

2.  Photos of the damage to the 41 foot vessel

3. Any written communication between any of the parties to these proceedings including emails, text messages, etc.

4. Estimates of damage to the hull of the 41 foot vessel

5. Any evidence of payments made by IMSE/Hasselman for the damage to the 41 foot vessel

6. Any written communication between IMSE and Nautimill relating to the payment (or non-payment) of IMSE commissions and the reasons therefor.

7. Any exhibit, listed, offered or admitted into evidence by any other party.

Legacy Marine objects to all "Exhibits" designated by Hasselman and/or IMSE on the grounds that the documents designated above have either not been produced in discovery in this matter or (with respect to Exhibit No. 1) were untimely produced on June 27, 2016.   Legacy Marine further objects to the admissibility of "Exhibits" 3 through 7 on the grounds that these designations fail to identify specific exhibits as required by the Court's Pre-Trial Notice, but rather categories of documents only.

**11.    DEPOSITION TESTIMONY TO BE OFFERED INTO EVIDENCE:**

**By Nautimill:**

Plaintiffs may use the deposition testimony of any witness who is not available for trial, including but not limited to the following witnesses:

Frederico Matsuda.

Additionally, Plaintiff may use the deposition testimony of any other witness who is unable to attend the trial in person.

Legacy Marine objects to the use of the deposition of Federico Matsuda on the grounds that it was taken for discovery purposes only, and the transcript of the deposition has not been

completed or reviewed by Legacy Marine.

12. **LIST OF CHARTS, GRAPHS, ETC.:**

   None at this time.

13. **WITNESSES:**

   **Nautimill "Will Call" Witnesses:**

   1.  Mr. Ruben Varela
       Nautimill, S.A.
       Sarandi 560 apartamento 302
       Montevideo, Uruguay

       To testify about the purchase of the M/V LEGACY SERVER, his prior dealings with
       Mr. David Hasselman, the operation of the vessel in Uruguay, the service for which the
       vessel was originally purchased, the service in which the vessel was actually engaged,
       any and all inspections, maintenance and repairs performed on the vessel, the
       requirements by the Uruguayan authorities for flagging the vessel, the damages claimed
       and other general related matters.

   2.  Mr. David Hasselman
       International Marine Sales and Export, LLC
       270 Borman Drive
       Merritt Island, Florida 32953
       321-759-0323

       To testify regarding the purchase of the M/V LEGACY SERVER, his prior and other
       dealings with Mr. Robert Boudreaux and with Nautimill, representations made by Mr.
       Boudreaux regarding the quality and condition of the M/V LEGACY SERVER, his
       actions as broker, his communications with Mr. Robert Boudreaux and Jessica
       Boudreaux regarding the M/V LEGACY SERVER, the arrangement for the Uruguayan
       officer's visit to the M/V LEGACY SERVER prior to purchase, the visit aboard the
       M/V LEGACY SERVER in February 2014, and other related matters within his
       personal knowledge and expertise.

   3.  Capt. Jorge Pérez Castro
       Capitán de Navío (CIME) – Comisión Técnica - Surveyor
       Edificio Comando Gral. De la Armada
       Ramba 25 de Agosto de 1825 s/n
       CP 11000
       Montevideo, Uruguay
       Cell: 099-679-038

       To testify regarding the visit aboard the M/V LEGACY SERVER in February 2015,

and the requirements for flagging a vessel under Uruguay's law.

4. Federico Matsuda (via deposition)
   Constructora OAS S.A.
   Plaza Independencia 831
   Edificio Plaza Mayor, Oficina 307
   Montevideo, Uruguay

   To testify regarding OAS's need in 2014 for a vessel of 2,000 HP, the daily rate at
   which OAS was willing to pay for a pushboat of 2,000 HP back in 2015, the term or
   length of the contract OSA was willing to sign for a 2,000 HP vessel among other
   related topics.

5. Capt. Jose Enrique Maran
   Nautimill, S.A.
   Sarandi 560 apartamento 302
   Montevideo, Uruguay

   To testify regarding Nautimill's fleet, the horsepower capacity of the M/V LEGACY
   SERVER (now DOSCAPI S), the maintenance and performance of the M/V LEGACY
   SERVER (now DOSCAPI S), his computation of the cost of replacing the propulsion
   equipment. Capt. Maran will provide expert opinion testimony as a Naval Engineer
   regarding the condition of the propulsion equipment installed on the M/V LEGACY
   SERVER (now DOSCAPI S) and other matters as outlined in his technical report
   previously submitted in this matter.

6. Norm J. Dufour Jr.
   Marine surveyor with Dufour, Laskay & Strouse, Inc.
   3939 N Causeway Blvd., Ste 300
   Metairie, La 70002

   To testify regarding his inspection of the propulsion equipment of the M/V LEGACY
   SERVER (now DOSCAPI S) in July 2015, the condition of the engine room of the
   M/V LEGACY SERVER (now DOSCAPI S) in July 2015. Mr. Dufour will also
   provide expert opinion testimony in the fields of marine engineering regarding the
   characteristics of the propulsion equipment installed on the M/V LEGACY SERVER
   (now DOSCAPI S), the condition of the engines and any effect on the performance
   and ability to generate horsepower, the costs of replacing the engines, and other
   matters as outlined in his report dated April 7, 2016.

7. Wayne C. Wingate
   Wingate Marine, LLC
   20117 Hollyhills Dr. N.E
   Bothell, WA 98011

   To provide expert opinion testimony as Naval Architect regarding the strain gage test

performed by Frank & Jimmies Propellers in November 2014, other methods available to determine an engine's horsepower, the horsepower and RPM generated by the engines and propellers of the M/V LEGACY SERVER (now DOSCAPI S), and other matters consistent with his expert report previously submitted in this matter.

8.  Robert Boudreaux, Sr.
    Legacy Marine Transportation LLC
    4673 Bayouside Dr.
    Chauvin, LA 70344

    To testify regarding the sale of the M/V LEGACY SERVER (now DOSCAPI S) to Nautimill, representations made prior to the sale regarding the vessel's horsepower, its condition and warranty, the vessel inspection conducted by the Uruguayan Navy officers in February 2014, the rebuilding of the propulsion equipment, any tests performed prior to the sale to determine the vessel's horsepower, the purchase from Hawthorn of a set of Caterpillar engines in February of 2013, the quote provided to Hasselman for the sale of the Caterpillar engines purchased from Hawthorn in February 2013, and other related matters.

9.  Robert Boudreaux, Jr.
    R&R Boats, Inc.
    4673 Bayouside Dr.
    Chauvin, LA 70344

    To testify regarding the work performed to rebuild the engines of the M/V LEGACY SERVER (now DOSCAPI S) and all propulsion equipment installed therein and any tests performed to determine the engines' horsepower.

10. Jessica Boudreaux
    Legacy Marine Services, LLC
    4673 Bayouside Dr.
    Chauvin, LA 70344

    To testify regarding her communications with David Hasselman regarding the sale of the M/V LEGACY SERVER (now DOSCAPI S), the issuance of multiple Bills of Sales, her supply of the serial numbers for the engines and generators of the M/V LEGACY SERVER (now DOSCAPI S) to Hasselman, the purchase from Hawthorn of a set of Caterpillar engines in February of 2013, and other related matters.

**Nautimill "May Call" witnesses:**

11. Robert Tournet
    Louisiana CAT
    3799 W. Airline Highway
    Reserve, LA 70084

To testify regarding the quote for replacement or comparable engines to those installed on the M/V LEGACY SERVER (now DOSCAPI S).

12. Jim Fellis or Mark Reza or another representative of
Hawthorne Power Systems
16945 Camino San Bernardo, Bldg. D
San Diego, CA 92127
Tel. 858-376-6800

To testify regarding the sale of a set of Caterpillar engines to R&R Boats in February 2013.

13. James Harrison or another records custodian for
Frank & Jimmie's Propeller
200 SW 6 Street
Fort Lauderdale, FL 33301
1-800-228-6077 - 954-467-7723

To testify regarding the engagement of Frank & Jimmies' Propellers by Nautimill for the true torque strain gage test performed on the M/V LEGACY SERVER (now DOSCAPI S) in November 2014 and as records custodian of the report generated by his company as a result of such test.

14. Alejandro Bo Duran
Technician for Finning CAT (Caterpillar distributor)
Juan Burghi 2646 Ruta 1 y Camino Cibils C.P. 12800
Montevideo, Uruguay

To testify regarding his inspection of the engines of the M/V LEGACY SERVER (now DOSCAPI S) in September 2014.

15. One or more rebuttal witness to be designated at the conclusion of the Defendant's case

in chief;

16. Any other witness listed or called by or on behalf of any other party in this case or

whose identity may be learned subsequent to this date.

**Legacy Marine's Will Call Witnesses:**

1.     Robert Boudreaux, Sr.:  Mr. Boudreaux will testify concerning the facts and circumstances of the sale of the Vessel from Legacy Marine to Nautimill, including but not limited to communications between Legacy Marine and Hasselman prior to and after the sale and the inspection and sea trial of the Vessel by representatives of Nautimill, as well

as the work performed by Legacy Marine and its affiliated companies to purchase, construct and recondition the Vessel and all equipment installed therein.

2.    Robert Boudreaux, Jr.:   Mr. Boudreaux will testify concerning the facts and circumstances of the inspection and sea trial of the Vessel by representatives of Nautimill, as well as the work performed by Legacy Marine and its affiliated companies to purchase, construct and recondition the Vessel and all equipment installed therein.

3.    Dylan Boudreaux:    Mr. Boudreaux will testify concerning the facts and circumstances of the inspection and sea trial of the Vessel by representatives of Nautimill.

4.    Captain Roy Pena:   Capt. Pena will testify concerning the facts and circumstances of the inspection and sea trial of the Vessel by representatives of Nautimill, as well as the transport of the Vessel from Bourg, Louisiana to Houston, Texas and its loading onto the M/V GDANSK.

5.    David Hasselman:   It is anticipated that Mr. Hasselman will testify concerning the facts and circumstances of the sale of the Vessel from Legacy Marine to Nautimill, including but not limited to communications with Legacy Marine and Nautimill prior to and after the sale and the inspection and sea trial of the Vessel by representatives of Nautimill.

6.    Jay Webster:   Mr. Webster will provide expert testimony in the fields of marine engineering and marine surveying.   Mr. Webster has authored a report submitted in this matter that addresses and responds to the reports and other documents disclosed by Nautimill including but not limited to the reports issued by Finning CAT, F&J, Captain Maran, Mr. Norman Dufour and Mr. Wayne Wingate.

**Legacy Marine's May Call Witnesses:**

7.    Jessica Boudreaux:   Mrs. Boudreaux may be called to provide additional testimony concerning the facts and circumstances of communications, as well as documents exchanged, between Legacy Marine and Hasselman.

8.    Taylor Landry:   Mr. Landry may be called to provide additional testimony concerning the work performed by Legacy Marine and its affiliated companies to construct and recondition the Vessel and all equipment installed therein.

9.    Mike Kelpsch:   Mr. Kelpsch may be called to provide testimony concerning the propellers installed on the Vessel.

10.    Michael Thompson:    Mr. Thompson may be called to provide testimony concerning his conversations with Mr. Hasselman and the affidavit executed by Mr. Hasselman in that certain matter captioned:  *Operaciones Tecnicas Marinas, S.A.S. v. Diversified Marine Services, LLC, et al.*, United States District Court for the Eastern District of Louisiana, Ca. No. 12-1979.

**IMSE and Hasselman Will Call Witnesses:**

-42-

1. David Hasselman to testify about the representations made by Robert Boudreaux and Jessica Boudreaux relating to the age, condition and horsepower of the engines in the Legacy Server.

2. Ruben Varela to testify as to his experience with Hasselman over the past 8 or so years that they have done business with each other.

**IMSE and Hasselman May call witnesses:**

1. Jorge Perez Castro to testify as to the conversation to which he was privy on the bridge of the Legacy Server.

2. Any witness listed or called by any other party.


The parties submit that the witness lists were filed in accordance with prior court orders.

Additionally, expert reports have been provided to all parties in accordance with prior court orders.

**14.    JURY/NON JURY:**

This is a non jury case.

**15.    BIFURCATION:**

The issue of liability will not be tried separately from that of quantum.

**16.    STATEMENT ON OTHER MATTERS:**

No other matters may expedite the disposition of the case.

**17.    TRIAL LENGTH:**

Trial shall commence on Monday, July 18, 2016 at 8:30 a.m.   It is estimated that trial will last two (2) days.

**18.    CONFERENCE AMONG COUNSEL:**

This pre-trial order has been formulated after conference at which counsel for the respective parties appeared in person and then again by telephone.   Reasonable opportunity has been afforded counsel for corrections, or additions, prior to signing.   Hereafter, this order will

control the course of the trial and may not be amended except by consent of the parties and the

Court, or by order of the Court to prevent manifest injustice.

**19.    SETTLEMENT:**

    The possibility of settlement of this case was considered, and the parties participated in a

settlement conference with Magistrate Judge Michael North on June 8, 2016.

Respectfully submitted,

s/Iliaura Hands
ILIAURA HANDS (#23115)
MACHALE A. MILLER (#9499)
I. MATTHEW WILLIAMSON (#13532)
**MILLER & WILLIAMSON, LLC.**
1515 Poydras Street, Suite 2130
New Orleans, LA 70112
Telephone:    504-525-9800
Fax:               504-525-9820

*Attorneys for Nautimill, S.A*

s/ Joseph R. McMahon, III
JOSEPH R. McMAHON, III, #21769
110 Ridge lake Drive
Metairie, Louisiana 70001
Telephone: (504) 828-6225
Facsimile: (504) 828-6201

*Counsel for David Hasselman and*
*International Marine Sales & Export,*
*LLC*

/s/ John A. Cangelosi
ROBERT J. BURVANT (LA Bar No. 19114)
JOHN A. CANGELOSI (LA Bar No. 26835)
**KING, KREBS & JURGENS, P.L.L.C.**
201 St. Charles Avenue, 45th Floor
New Orleans, Louisiana 70170
Telephone:  (504) 582-3800
Facsimile:  (504) 582-1233

*Attorneys for Legacy Marine Transportation, LLC*

**DISTRICT JUDGE**

-44-