UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

NAUTIMILL S.A.                                    CIVIL ACTION

VERSUS                                            NO: 15-1065

LEGACY MARINE                                     SECTION: R(5)
TRANSPORTATION, LLC

## ORDER AND REASONS

Defendant Legacy Marine Transportation, LLC moves for summary judgment on all of plaintiff Nautimill S.A.'s claims[1] and, separately, for summary judgment on all of David Hasselman and International Marine Sales and Export, LLC's counterclaims.[2] For the following reasons, the Court denies in part and grants in part both motions.

## I.     BACKGROUND

This dispute arises out of Nautimill S.A.'s purchase of the pushboat M/V LEGACY SERVER from Legacy Marine Transportation, LLC, a Louisiana LLC, in April 2014.[3]  Nautimill alleges that Legacy misled Nautimill and Nautimill's Florida agent David Hasselman about the

---

[1]     R. Doc. 49.
[2]     R. Doc. 50.
[3]     R. Doc. 1 at 2 ¶ 5.

condition of the Legacy Server before the purchase.[4]  Specifically, Nautimill asserts that Legacy portrayed the vessel as a new 2,000 horsepower pushboat.[5]  In reality, the vessel's two engines produce between 1,200 and 1,600 horsepower,[6] and both engines, along with one of the two propellers, are remanufactured.[7]  In addition, Nautimill alleges that the engines are mismatched in that they do not produce identical horsepower.[8]  Nautimill brings claims for fraudulent and negligent misrepresentation, breach of the warranty against redhibitory defects, breach of the warranty of fitness for ordinary use, and breach of contract.[9]

In response to Nautimill's claims, Legacy filed a third party complaint against Hasselman and his Florida company International Marine Sales and Export, LLC (IMSE), seeking indemnity and damages.[10]  Hasselman and IMSE have filed counterclaims against Legacy, alleging that Legacy's misrepresentations regarding the vessel caused Hasselman and IMSE to lose a portion of their commission on the sale.[11]  Hasselman and IMSE also

---

[4]    *Id.*
[5]    *Id.*
[6]    R. Doc. 65-10 at 2; R. Doc. 56-4 at 21.
[7]    R. Doc. 65-4 at 26, 31.
[8]    R. Doc. 1 at 3 ¶ 9.
[9]    *Id.* at 5-11.
[10]   R. Doc. 13.
[11]   R. Doc. 23.

counterclaim for damage allegedly sustained to another boat transported by Legacy.[12]

## A.    Factual Background

Nautimill is a Uruguayan corporation in the business of shuttling barges between ports on the Uruguay and Parana Rivers.[13]   In 2013, the company was in the market for an additional pushboat.  As part of its search, Nautimill contacted Hasselman, an experienced vessel broker.  According to Hasselman, Ruben Varela, the president of Nautimill, specified to Hasselman that he was looking for a newly-constructed, 2,000 horsepower pushboat.[14]

On November 14, 2013, Hasselman—acting as Nautimill's agent— emailed Varela with details about the Legacy Server.[15]  The vessel was offered for sale by Legacy, and had been constructed by R&R Boats, an "affiliated entity" of Legacy.[16]  Hasselman's email described the vessel as a "BRAND NEW Tug" with "Twin Cat[erpillar] 3412 [engines] rated 1,000 Hp each." It further stated that the vessel had been used only for "Sea Trail [sic.] hours (8 hours time)" and came with a "1 Year Warranty on all equipment and the

---

12    *Id.*
13    R. Doc. 65-3 at 1; R. Doc. 1 at 4 ¶13.
14    R. Doc. 49-4 at 6.
15    R. Doc. 65-2 at 1.
16    R. Doc. 49-5 at 1.

Hull, Deck, and Paint Work."[17]   The email listed a purchase price of "$2,200,000.00 USD FIRM."[18]

In February 2014, Hasselman and two Uruguayan naval officers, Captain Jorge Perez Castro and Edgardo Costa, travelled to Louisiana to inspect another boat.[19]   While the officers were inspecting that vessel, Hasselman arranged an impromptu viewing of the Legacy Server.[20]   The parties agree that the Uruguayan officers visited the engine room and travelled some distance aboard the vessel, but dispute whether this visit constituted a full "inspection" and "sea trial."[21] During this visit, Captain Perez Castro observed a dial which indicated the engines had been used for a total of 10 hours.[22]  Robert Boudreaux, a member of Legacy,[23] accompanied the three men during their trip aboard the vessel.[24]

In April 2014, Nautimill bought the Legacy Server from Legacy for $2.1 million.[25]   Hasselman and his company IMSE brokered the purchase on behalf of Nautimill.[26]   As part of the sale, Nautimill and Legacy executed a

---

[17]    R. Doc. 65-2 at 1.
[18]    *Id.*
[19]    R. Doc. 49-4 14-15.
[20]    R. Doc. 49-2 at 2; R. Doc. 65-19 at 3.
[21]    *Compare* R. Doc. 49-2 at 2 *and* R. Doc. 65-19 at 3.
[22]    R. Doc. 67-5 at 17-18.
[23]    R. Doc. 49-5 at 1.
[24]    *See* R. Doc. 65-4 at 27; R. Doc. 65-1 at 9-10.
[25]    R. Doc. 49-2 at 2, 3; R. Doc. 65-19 at 1, 4.
[26]    R. Doc. 49-2 at 2; R. Doc. 65-19 at 1.

"Vessel Purchase Agreement."[27]  The Agreement states that "[t]he vessel (s) and all her tackle apparel, gear, machinery, equipment and furnishings are sold AS IS, WHERE IS, without warranties of merchantability or fitness for any particular use" and that "the buyer hereby accepts the vessel (s) on an AS IS, WHERE IS BASIS."[28]  The Agreement also lists under "Terms and Conditions" that "Main engine(s) and Generator to be in proper working condition" and that "Buyer or their representatives have had previous inspect and sea trial of the vessel and found it suitable to their needs."[29]  The Agreement provides no details regarding the age or power of the vessel's engines.[30]  The parties also completed a U.S. Coast Guard bill of sale, which states:  "EQUIPMENT   WARRANTIED   BY   THE   VARIOUS MANUFACTURERS."[31]

The Legacy Server arrived in Uruguay on or about May 25, 2014 and began service as a pushboat in July 2014.[32]  In January 2015, attorneys for Nautimill complained to Legacy that the vessel's two propellers were different sizes and that the engines were mismatched, used rather than new,

---

[27]     R. Doc. 49-5 at 8-13.
[28]     *Id.* at 9.
[29]     *Id.*
[30]     *Id.* at 8-13.
[31]     *Id.* at 15.
[32]     R. Doc. 49-2 at 2; R. Doc. 65-19 at 1.

and produced roughly 1,200 horsepower rather than 2,000.[33]   This suit followed on April 2, 2015.[34]

## II.   LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *see also Little*, 37 F.3d at 1075. "No genuine dispute of fact exists if the record taken as a whole could

---

[33]   R. Doc. 49-5 at 18.
[34]   R. Doc. 1.

not lead a rational trier of fact to find for the non-moving party." *EEOC v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014).

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991). The nonmoving party can then defeat the motion by either countering with evidence sufficient to demonstrate the existence of a genuine dispute of material fact, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial. *See, e.g., id.*; *Little*, 37 F.3d at 1075 ("Rule 56 *mandates* the entry of summary judgment, after adequate time for discovery and upon motion,

7

against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." (quoting *Celotex*, 477 U.S. at 322)).

## III. DISCUSSION

### A. Choice of Law

All parties briefed this motion pursuant to Louisiana law. The Vessel Purchase Agreement is not a maritime contract, s*ee Gulf Coast Shell & Aggregate LP v. Newlin*, 623 F.3d 235, 240 (5th Cir. 2010) ("[C]ontracts for the construction or sale of a vessel are not maritime contracts."), and state law would therefore ordinarily apply. The agreement, however, contains a choice of law provision which states that it "shall be construed in accordance with General Maritime Laws of the US as supplemented by Louisiana State laws . . . ."[35] No party cited this provision in its summary judgment briefing.

"It is well established that parties generally are bound by the theory of law they argue in the district court, absent some manifest injustice." *Am. Int'l Trading Corp. v. Petroleos Mexicanos*, 835 F.2d 536, 540 (5th Cir. 1987) (internal quotations omitted). Manifest injustice "exists in extreme circumstances," and requires more than a mere showing "that application of

---

[35]    R. Doc. 49-5 at 10.

another jurisdiction's law would yield a different result." *Id.*; *see also* Sampson *v. GATX Corp.,* 547 F. App'x 369, 377 (5th Cir. 2013) (noting that the parties "have an obligation to call the applicability of another state's law to the court's attention in time to be properly considered."). Because there has been no showing of manifest injustice, this Court need not consider the effect of the choice of law provision, and may apply Louisiana law to all claims at issue in this case. *See e.g. Goldman Sachs Bank USA v. Moreno*, No. 15-2018, 2016 WL 3040450, at *2 n.13 (W.D. La. May 24, 2016) (applying Louisiana law, despite "some question as to the body of law governing this matter," where parties briefed pursuant to Louisiana law); *Preis v. New England Life Ins. Co.*, No. 07-582, 2009 WL 1530994, at *1 n.1 (W.D. La. May 28, 2009) (applying Louisiana law where both parties "rel[ied] upon Louisiana law for their arguments"); *J & D Aircraft Sales, LLC v. Cont'l Ins. Co.*, No. 03-0007, 2004 WL 2389445, at *5 (N.D. Tex. Oct. 26, 2004) ("Because the parties appear to agree that Texas law should apply, and because there is no showing that manifest injustice would otherwise result, the Court will apply Texas law to the issues presented in the parties' summary judgment papers.").

## B. Nautimill's Fraudulent Misrepresentation Claim

Legacy challenges Nautimill's fraudulent misrepresentation claim on two fronts. First, it attacks the plausibility of Nautimill's allegation that

Boudreaux represented the Legacy Server's engines as 1,000 horsepower each. Second, Legacy argues that Nautimill could have determined the true condition of the vessel "without difficulty, inconvenience, or special skill" and that the fraud claim therefore fails under Louisiana Civil Code article 1954. Disputed factual issues preclude both arguments.

Under Louisiana's Civil Code, "[f]raud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction." La. Civ. Code art. 1953. In the context of a contract of sale, "[t]he elements of an action for fraud are: '(1) a misrepresentation, suppression, or omission of true information; (2) the intent to obtain an unjust advantage or to cause damage or inconvenience to another; and (3) the error induced by a fraudulent act must relate to a circumstance substantially influencing the victim's consent to (a cause of) the contract.'" *Jones v. Wells Fargo Bank, N.A.*, 626 F. App'x 500, 504-05 (5th Cir. 2015) (quoting *Shelton v. Standard/700 Assocs.,* 798 So.2d 60, 64 (La. 2001)). Fraud, however, "does not vitiate consent when the party against whom the fraud was directed could have ascertained the truth without difficulty, inconvenience, or special skill." La. Civ. Code art. 1954. As the Fifth Circuit holds, "summary judgment is rarely proper in fraud cases because the intent required to establish fraud is a factual question 'uniquely

within the realm of the trier of fact because it so depends upon the credibility of witnesses.'" *Rimade Ltd. v. Hubbard Enters., Inc.*, 388 F.3d 138, 144 (5th Cir. 2004) (quoting *Beijing Metals & Minerals v. Amer. Bus. Ctr.*, 993 F.2d 1178, 1185 (5th Cir. 1993)).

With regard to Legacy's first argument, whether Legacy misrepresented the horsepower and age of the Legacy Server's engines is plainly a disputed question of fact.  Legacy impliedly concedes this point in its briefing when it argues that "[b]esides the . . . testimony of Mr. Hasselman . . . , Nautimill does not have a shred of evidence to support [the misrepresentation] claims."[36]  In his deposition, Hasselman states—with varying certainty and specificity—that Legacy represented the vessel's engines as 2,000 horsepower several times.  First, Hasselman claims that Legacy portrayed the vessel as having 2,000 horsepower when he initially initial called to inquire about a pushboat.[37]  Second, Hasselman alleges that Legacy—through either its principal Robert Boudreaux or its employee Jessica—provided Hasselman with the specifications that he emailed to Nautimill in November 2013.[38]  These specifications described the vessel as

---

[36]     R. Doc. 49-3 at 10. This statement ignores, of course, the testimony of Captain Perez Castro.

[37]     *See* R. Doc. 65-1 at 6, 39 ("[W]hen I asked about a boat, I said, 'I need something 2,000 horsepower.'  They offered me the LEGACY SERVER.  Q: On the Phone?  A: I imagine that was the first time, yes.").

[38]     *Id.* at 2-3 ("Q: . . . where did you get . . . the specifications of the

"BRAND NEW" and the engines as rated at 1,000 horsepower each.[39]  Third, Hasselman states that Robert Boudreaux confirmed that the engines totaled 2,000 horsepower during the February 2014 viewing performed by Hasselman and the Uruguayan naval officers.[40]  Hasselman maintains that he was never told that the engines were rebuilt rather than new.[41]  Hasselman further states that, had he known the true age and power of the engines, he would not have recommended that Nautimill purchase the vessel.[42]

Captain Jose Perez Castro, one of the Uruguayan naval officers that viewed the vessel on behalf of Nautimill, partially corroborates Hasselman's account.  Although they differ as to who asked about the engines, Captain Perez Castro alleges that Boudreaux stated during the November viewing that each engine produced 1,000 horsepower.[43]

---

vessel?  A: I would have gotten it from Jessica or from Robert.  And since I had very little communication with Robert in writing, I'm assuming it was from Jessica.  Q: In writing?  A: I imagine so.  Most of it I got was from Jessica or from inspection.  I mean, there's very specific details in here, transmissions, engines, fuel capacity.  All of this information had to come from somebody.  I didn't pull it out of thin air.").

[39]    R. Doc. 65-2 at 1.

[40]    R. Doc. 65-1 at 10, 34-35 ("[One of the Uruguayan naval officers a]sked, you know, 'The horsepower is 1,000 horsepower each?' I don't know if he said 2,000 or 1,000 horsepower. And they said, 'yes.'  Q: Who is 'they'?  A: the Uruguayan naval officer.  Q: You said 'they' said yes.  A: Robert and whoever was standing there. Robert said 'yes' . . . .").

[41]    *Id.* at 18.

[42]    *Id.* at 24.

[43]    R. Doc. 67-5 at 12-14.

This testimony is sufficient to raise a fact issue as to Legacy's pre-purchase misrepresentations. Legacy's challenge to the plausibility of Nautimill's allegations simply asks this Court to weigh the evidence and decide that Nautimill's witnesses lack credibility.  Such an evaluation is improper at the summary judgment stage.  *EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 612 n.3 (5th Cir. 2009) (noting the well-established prohibition against a district court making credibility determinations or weighing evidence in ruling on summary judgment).  Legacy's first argument regarding the fraud claim therefore fails.

Legacy also argues that Nautimill could have determined the true condition of the vessel "without difficulty, inconvenience, or special skill" and that Nautimill's fraud claim therefore fails under article 1954.  In support, Legacy avers that had Nautimill researched the engine serial numbers, it could have easily discovered that they were neither new, nor capable of producing 1,000 horsepower.[44]  Legacy argues that the engine model number, which was provided to Hasselman, revealed the true horsepower rating and that the model had been out-of-production since 2008.[45]  Legacy also points to Hasselman's testimony that a person performing an inspection of a boat should investigate engine serial numbers

---

[44]   R. Doc. 49-3 at 14-15.
[45]   *Id.* at 15.

as "part of their due diligence," as well as Hasselman's admission that Legacy sent him engine serial numbers, for the purpose of sourcing replacement parts, before the sale.[46]  Legacy also highlights Captain Perez Castro's admission that had he performed a "complete inspection" of the Legacy Server, he would have "noted the difference in the two engines and the difference in the two propellers."[47]  Finally, Legacy contends that both Hasselman and Nautimill are sophisticated parties with significant marine expertise.[48]

In response, Nautimill points to the testimony of Hasselman and its expert Norman Dufour, who both state that the freshly-painted engines appeared new from the outside.[49]  Dufour further maintains that the engines would have to be partially disassembled to determine they had been reconditioned,[50] and he disputes Legacy's suggestion that a marine expert would know the engines were used just by looking at the model number.[51]  With regard to the serial numbers, Nautimill points to Boudreaux's admission that the port engine serial number is "not a good number," in that

---

[46]     R. Doc. 49-4 at 20.
[47]     R. Doc. 67-2 at 3 (citing R. Doc. 67-5 at 17).
[48]     R. Doc. 49-3 at 13.
[49]     R. Doc. 65-17 at 1; R. Doc. 65-1 at 34.  Captain Perez Castro also testified that the vessel "seem[ed] to be a new boat."  R. Doc. 67-5 at 17.
[50]     R. Doc. 65-17 at 1.
[51]     *Id.* at 6.

it does not correspond to the engine on which it is stamped.[52]   Finally,
Nautimill asserts that its perceived need to inspect the vessel carefully was
reasonably reduced by Legacy's repeated confirmations of the engines'
horsepower and portrayal of the vessel as "brand new."

The parties' dispute on this point is largely a disagreement regarding
the level of diligence required by article 1954.  Two recent Fifth Circuit cases
are instructive.  In *Jones v. Wells Fargo Bank, N.A.*, 626 F. App'x 500 (5th
Cir. 2015), a homebuyer sued the bank that sold her a previously-foreclosed
property alleging fraud and redhibitory defect.  As part of the sale, the
homebuyer signed a mold disclosure that "advised that mold and/or other
microscopic organisms may exist at the property" and "put Buyers on notice
to conduct their own due diligence regarding this matter using appropriate,
qualified experts."  *Id.* at 503.  After the purchase, the homebuyer discovered
that her new home had extensive mold damage, which had been concealed
by cosmetic repairs.   *Id.* at 502.   The District Court dismissed the

---

[52]     R. Doc. 65-4 at 25.  There are multiple conflicting accounts of
the state of the Legacy Server's engine serial numbers. Hasselman
maintains that the engines have no serial numbers at all.  R. Doc. 65-1 at 27.
Norman Dufour, Nautimill's expert, states that the port engine number
cannot be retrieved because it has been partially "obliterated."  R. Doc. 65-
17 at 6.  Finally, a report from a Uruguayan Caterpillar engine technician
finds that one of the engines' serial numbers corresponds to an electronic
motor, and therefore clearly does not match the diesel engine it is stamped
on.  R. Doc. 65-18 at 4.

homeowner's fraud claims, finding that "the Mold Disclosure and Release should have at least caused Plaintiff to investigate, thereby allowing her to ascertain the truth 'without difficulty, inconvenience, or special skill.'" *Jones v. Wells Fargo Bank, N.A.*, No. 13-2513, 2014 WL 2118036, at *4 (W.D. La. May 20, 2014). The Fifth Circuit reversed. It held that the homeowner "could not 'have ascertained the truth without difficulty, inconvenience, or special skill' because the mold was within the walls and had been actively concealed by Wells Fargo." *Jones*, 626 F. App'x at 505.

In *Petrohawk Properties, L.P. v. Chesapeake Louisiana, L.P.*, 689 F.3d 380 (5th Cir. 2012), the Fifth Circuit upheld the trial court's finding of fraud in the procurement of a mineral lease. The fraudulent misrepresentation at issue "concerned the legal effect of recordation on the validity of a mineral lease." *Id.* at 390. Defendants argued that the lessor could easily have ascertained the true rule, and the fraud claim was therefore precluded by article 1954. *Id.* The court rejected this argument because the lessor's "only likely avenue to uncovering the truth was by consulting a knowledgeable attorney—which would have entailed difficulty and inconvenience." *Id.* at 390-91. The court explained that "[w]hen a fraudulent misrepresentation can be easily uncovered, the complaining party will be expected to exercise this minimum amount of diligence. However, when uncovering the truth requires familiarity with peculiar technicalities, which calls for a special skill,

the complaining party cannot be blamed for lack of diligence." *Id.* at 390 (internal quotations omitted).  The court also noted that "in determining the diligence of the complaining party, subjective aspects such as a party's business experience or professional capacity must be taken into account." *Id.* (internal quotations and modifications omitted).

Here there is at least a factual issue as to whether the condition of the Legacy Server could have been determined without difficulty, inconvenience, or special skill.  Nautimill's witnesses testified that visual inspections of the engines did not reveal that they were reconditioned, and that determining the truth would have required "[s]ome amount of disassembling" of the engines.[53]  Further, researching the engine serial or model numbers—like the legal research at issue in *Petrohawk*—also required both skill and "familiarity with peculiar technicalities." *Petrohawk*, 689 F.3d at 390.  Fortifying this inference is evidence that the serial numbers did not meaningfully correspond with the vessel's engines.  Finally, it appears to be undisputed that determining that one of the propellers was reconditioned would have required placing the vessel in drydock, and that such an operation is costly and time-consuming.[54]

---

[53]   R. Doc. 65-17 at 1.
[54]   *See* R. Doc. 67-5 at 6-7.

Although Legacy relies on the business experience of Nautimill and its agent Hasselman and their opportunity to inspect the vessel, that evidence does not negate the fact issues concerning whether discovery of the vessel's condition entailed inconvenience and difficulty, and required special skill. Legacy is not entitled to summary judgment on its argument that Nautimill's fraud claim fails under 1954.

To resist this conclusion, Legacy cites *Smoothie King Franchises, Inc. v. Southside Smoothie & Nutrition Ctr., Inc.*, No. 11-2002, 2012 WL 1698365 (E.D. La. May 15, 2012), *aff'd* 516 F. App'x 362 (5th Cir. 2013). In that case, defendants raised fraud in the inducement as an affirmative defense to claims that they had violated a non-compete clause in a franchise contract. *Id.* at *1-2. The alleged misstatements concerned the plaintiffs' compliance with complex provisions of federal and state consumer protection law. *Id.* at *10. In that situation, where defendants had the opportunity to consult their own independent advisors to advise them on the legal effect of the contract, the court found defendants' fraud defense barred under article 1954. *Id.* Unlike the *Smoothie King* defendants, Nautimill has alleged a false statement of fact, the falsity of which was allegedly known to Legacy. Nautimill could not have ascertained the truth by simply reading the Vessel

18

Purchase Agreement with the help of experts.  The cases are therefore distinguishable on their facts.[55]

## C. Nautimill's Negligent Misrepresentation Claim

Nautimill also alleges negligent misrepresentation under Louisiana Civil Code articles 2315 and 2316. "To make out a negligent misrepresentation claim in Louisiana: (1) there must be a legal duty on the part of the defendant to supply correct information; (2) there must be a breach of that duty, which can occur by omission as well as by affirmative misrepresentation; and (3) the breach must have caused damages to the plaintiff based on the plaintiff's reasonable reliance on the misrepresentation." *Kadlec Med. Ctr. v. Lakeview Anesthesia Associates*, 527 F.3d 412, 418 (5th Cir. 2008).  Mirroring its argument under the fraud claim, Legacy contends that Nautimill's reliance on Boudreaux's alleged statements is unreasonable in light of Nautimill's opportunity to inspect the

---

[55]     In its reply, Legacy cites three more cases on the article 1954 issue.  These cases are clearly distinguishable.  In *Busby v. Par. Nat. Bank*, 464 So. 2d 374 (La. App. 1 Cir. 1985), the court held that plaintiffs could not reasonably construe vague statements by bank employees as unqualified loan commitments.  In *Crow v. Laurie*, 729 So. 2d 703 (La. App. 1 Cir. 1999), the appellate court *reversed* a trial court judgment that a claim for fraud in the sale of a boat was barred by article 1954.  Finally, in *In re Ford Motor Co. Bronco II Prod. Liab. Litig.*, 982 F. Supp. 388, 397 (E.D. La. 1997), the court found that it was not reasonable for plaintiffs to remain unaware of a defect in a vehicle model "considering the widespread attention [the defect] received prior to and during the years they purchased their vehicles."

vessel.[56]   Legacy cites no authority, and the Court has not found any, suggesting that the diligence required under the reasonable reliance prong of negligent misrepresentation is greater than that required by article 1954 of a purchaser alleging fraud.   For the reasons discussed above, there is an issue of material fact as to whether Nautimill's reliance on Legacy's representations was justifiable.   Legacy's request for summary judgment on Nautimill's negligent misrepresentation claims must therefore be denied.

### D.  Nautimill's Redhibition Claim

Under the Louisiana law of redhibition, a "seller warrants the buyer against redhibitory defects, or vices, in the thing sold."   La. Civ. Code art. 2520.  A defect is redhibitory when it either (1) "renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect"; or (2) "diminishes its usefulness or its value so that it must be presumed that a buyer would still have bought it but for a lesser price."   *Id.*  Further, "a seller who declares that the thing has a quality that he knows it does not have" can be liable under redhibition.   La. Civ. Code. art. 2545; *see also id.* cmt. (a) (explaining that article 2545 allows a buyer to bring an action in redhibition "against a seller who, knowingly, made a false declaration regarding a quality of the thing.").

---

[56]      R. Doc. 49-3 at 16.

A seller, however, "owes no warranty for defects in the thing that were known to the buyer at the time of the sale, or for defects that should have been discovered by a reasonably prudent buyer of such things." La. Civ. Code art. 2521.   To determine whether a defect should have been discovered, "courts consider whether a reasonably prudent buyer, acting under similar circumstances, would discover it through a simple inspection of the thing sold." *Spraggins v. Lambeth*, 973 So. 2d 165, 167 (La. App. 2 Cir. 2007).   A "simple inspection" requires "more than casual observance," *id.*, but "[t]he buyer is under no obligation . . . to inspect with expertise or to deface the thing purchased while inspecting it." *Jones v. Wells Fargo Bank, N.A.*, 626 F. App'x 500, 504 (5th Cir. 2015) (quoting *McGough v. Oakwood Mobile Homes, Inc.*, 779 So.2d 793, 801 (La. App. 2 Cir. 2000)); *see also Amend v. McCabe*, 664 So. 2d 1183, 1188 (La. 1995) (holding that, in the context of termite damage, when all of the damage "is concealed within the home's structure (*e.g.*, walls and floors) it is considered unapparent because it is not discoverable by a simple inspection").

According to Legacy, Nautimill's redhibition claims fail because the problems identified with the vessel do not rise to the level of a "defect" and should have been discovered by simple inspection.   These arguments are unavailing.

Here there is an issue of material fact as to whether the Legacy Server suffered from a redhibitory defect. *See Hatten v. Estes Cadillac, Inc.*, 625 F. Supp. 913, 916 (E.D. La. 1986) (citing *Newman v. Dixie Sales & Service*, 387 So.2d 1333, 1339 (La. App. 1 Cir. 1980)) (existence of redhibitory effect is question of fact).  Nautimill has produced evidence that the Legacy Server is significantly less useful or valuable than a 2,000 horsepower pushboat. Varela, Nautimill's president, stated in deposition that because of increased capacity, a 2,000 horsepower pushboat would have earned Nautimill $8,000 per day, and the Legacy Server earns only $4,000.[57]  As noted, under article 2545 claims that a seller represented "that the thing has a quality that [the seller] knows it does not have" are redressible in redhibition.  Evidence that Boudreaux knowingly misrepresented that the Legacy Server produced 2,000 horsepower, and that the vessel is significantly less useful or valuable than a 2,000 horsepower pushboat, creates a material fact question under article 2545.

Legacy's second argument fails for the same reasons as its diligence arguments under fraud and negligent misrepresentation.  Nautimill arranged for three experts to view the vessel and take it out on the water. There is evidence that the vessel appeared to be new at the time of the

---

[57]     R. Doc. 65-3 at 8-9.

viewing, and a dial installed in the vessel reported only ten hours of engine use.  The Court finds that there is at least an issue of fact as to whether this examination meets the "simple inspection" standard.  *See Crow v. Laurie*, 729 So. 2d 703 (La. App. 1 Cir. 1999) ("[A]lthough the trial court correctly determined the Crows were required to inspect the boat, it committed legal error by imposing upon the Crows a duty to perform a more extensive inspection than a 'simple inspection' . . . ."); *Buck v. Adams*, 446 So. 2d 895, 898 (La. App. 1 Cir. 1984) (the 'simple inspection' standard does not "require[] one to dry-dock a boat to check its seaworthiness.").

### E.  Nautimill's Claims for Breach of Warranty of Fitness for Ordinary Use and Breach of Contract.

Finally, Legacy challenges Nautimill's breach of warranty of fitness for ordinary use and breach of contract claims.  Because a claim for breach warranty of fitness for ordinary use is a contract claim, *see, e.g.*, *Chesapeake Louisiana, L.P. v. Innovative Wellsite Sys., Inc.*, No. 12-2963, 2014 WL 5796794, at *4 (W.D. La. Nov. 6, 2014), and Nautimill has not identified any other specific breach, the Court considers these claims together.  *See Nat'l Inspection & Repairs, Inc. v. George S. May Int'l Co.*, 600 F.3d 878, 886 (7th Cir. 2010) ("[I]n order to survive summary judgment, [the non-moving party] must point to a specific obligation that [the moving party] failed to

perform, and it cannot ask this court to speculate as to which provision or provisions [the moving party] might have breached.").

Under Louisiana Civil Code article 2524, a "thing sold must be fit for its ordinary use." In addition, "[w]hen the seller has reason to know the particular use the buyer intends for the thing, or the buyer's particular purpose for buying the thing, and that the buyer is relying on the seller's skill or judgment in selecting it, the thing sold must be fit for the buyer's intended use or for his particular purpose." *Id.*

Legacy argues that the record cannot support a finding that the vessel is unfit for either ordinary use or Nautimill's specific intended use.[58] Nautimill offers no fact or argument to rebut this contention. Furthermore, the parties do not dispute that the Legacy Server has been in service as a pushboat since July 2014.[59] Varela stated in his deposition that the vessel has experienced only "normal problems,"[60] and earns Nautimill $4,000 per day.[61] For these reasons, Nautimill has failed to raise a genuine issue of material fact regarding the vessel's fitness for ordinary use.

Although its complaint is not entirely clear on the point, Nautimill appears to also allege that the vessel was not fit for Nautimill's particular,

---

[58]     R. Doc. 49 at 19.
[59]     *See* R. Doc. 49-2 at 3 *and* R. Doc. 65-19 at 4.
[60]     R. Doc. 49-8 at 2.
[61]     R. Doc. 65-3 at 8-9.

intended use.[62]  To sustain this claim Nautimill must point to evidence that Nautimill relied on Legacy's "skill or judgment" in selecting the vessel.  La. Civ. Code art. 2524.  Nautimill has failed to do so.  The only evidence before the Court suggests that Nautimill relied on its own expertise, and the expertise of Hasselman, in selecting the specific type of pushboat it required.[63]  Although Legacy's allegedly offered the Legacy Server during Hasselman's initial call requesting a 2,000 horsepower pushboat, article 2524 requires more than a simple suggestion that a product has a specific attribute requested by the buyer.  Because Nautimill has not pointed to specific evidence in the record creating an issue of material fact as to whether the Legacy Server was fit for ordinary use, or whether Nautimill relied on Legacy's skill and judgment in selecting the vessel, summary judgment must be granted on Nautimill's claim for breach of the warranty of fitness for ordinary use.  Further, because Nautimill has identified no other provision of the Vessel Purchase Agreement allegedly breached by Legacy, summary judgment is also warranted on Nautimill's breach of contract claim.

---

[62]    R. Doc. 1 at 10 (alleging that "the vessel was not fit for the ordinary use in the marine towing service for which it was intended").

[63] *See, e.g.*, R. Doc. 49-4 at 6 (Varela specified to Hasselman that Nautimill wanted a new, 2,000 horsepower pushboat).

### F. Hasselman and IMSE's Claims

In their counterclaim Hasselman and his LLC, IMSE (collectively "IMSE") allege that (1) due to the intentional or negligent misrepresentations alleged by Nautimill, IMSE has not received part of its earned commission on the sale of the vessel; and (2) Legacy is liable for damage sustained by another boat, the 41' Ex USGG UTB #41440, during transport. Legacy moves for summary judgment on all of IMSE's claims. The Court considers each in turn.

### 1. Intentional Misrepresentation

In opposing IMSE's claims for intentional misrepresentation, Legacy incorporates its arguments—rejected above—in favor of summary judgment against Nautimill.  Beyond this repetition, Legacy's only opposition to the intentional misrepresentation claim is a statement, citing no authority or evidence, that "the legal cause of Hasselman's and/or IMSE's damages, if any, is not any alleged action or inaction attributable to Legacy, but rather Nautimill's breach of its contractual agreement to pay a commission to IMSE in full."[64]  This purely conclusory statement fails to meet Legacy's burden under Rule 56.  Summary judgment on IMSE's intentional misrepresentation claim is therefore not warranted.

---

[64]    R. Doc. 50-3 at 7.

## 2. Negligent Misrepresentation

With regard to IMSE's negligent misrepresentation claim, Legacy asserts that it owed IMSE no duty to accurately describe the Legacy Server before Nautimill's purchase.  Whether the defendant owed the plaintiff a duty is a "threshold issue in any negligence action." *Audler v. CBC Innovis Inc.*, 519 F.3d 239, 249 (5th Cir. 2008) (quoting *Meany v. Meany*, 639 So.2d 229, 233 (La. 1994)). "The relevant inquiry under Louisiana law in a negligent misrepresentation case is 'whether, as a matter of law, a duty is owed to this particular plaintiff to protect him from this particular harm.'" *Audler*, 519 F.3d at 249 (quoting *Barrie v. V.P. Exterminators, Inc.*, 625 So. 2d 1007, 1016 (La. 1993)).  Under Louisiana law, plaintiffs may recover in tort for purely economic loss caused by negligent misrepresentation even absent privity of contract.  *Barrie*, 625 So. 2d at 1014.

The Fifth Circuit has identified four factors used by Louisiana courts to determine whether a defendant owes a duty when, as here, the parties lack privity of contract or a fiduciary relationship:

> First, is whether the tortfeasor could expect that the plaintiffs would receive and rely upon the information.  Second, is whether the plaintiffs are members of the limited group for whose benefit and guidance the [information] was contracted and supplied. Third, is whether the [information] is prepared in the context of a business transaction for which the alleged tortfeasor received

compensation.  Fourth, is whether extending tort liability would
serve public policy.

*Audler*, 519 F.3d at 250.  Each of these factors supports extending Legacy's duty to avoid negligent misrepresentations to IMSE.  Under the first factor, Legacy could expect that IMSE would receive and rely on the alleged misrepresentations because they were allegedly made directly to Hasselman. Under the second factor, IMSE, as Nautimill's agent and a key player in the decision of whether to purchase the vessel, is a member of the limited group for whose benefit and guidance the information was supplied. *See Paul v. Landsafe Flood Determination, Inc.,* 550 F.3d 511, 517 (5th Cir. 2008) ("[B]oth *Barrie* and the Restatement focus on whether a plaintiff is a member of a limited, intended group for whom a report is prepared."). Third, Legacy allegedly prepared the information in the context of a business transaction (the sale of the vessel) for which it received compensation (the sale price of the vessel). *See Kadlec Med. Ctr. v. Lakeview Anesthesia Associates,* No. 04-997, 2005 WL 1309153, at *5 (E.D. La. May 19, 2005) (distinguishing a "gratuitous situation," which does not give rise to a duty, "from the situation where information is given 'in the course of the defendant's business.'" (quoting Restatement (Second) of Torts § 552 cmt. c.)).

Finally, the Court finds that a Louisiana court would likely determine that extending tort liability in this case serves public policy. This conclusion is buttressed by numerous Louisiana cases finding that a duty is owed when "there is communication of the misinformation by the tortfeasor *directly* to the user or the user's agent" and the user relied on it. *Barrie*, 625 So. 2d at 1016 (emphasis added); *see Cypress Oilfield Contractors, Inc. v. McGoldrick Oil Co.*, 525 So.2d 1157, 1162 (La. App. 3 Cir. 1988) (in case of direct communication, bank had duty to non-customer); *Payne v. O'Quinn*, 565 So.2d 1049, 1054 (La. App. 3 Cir. 1990) (termite inspector, hired by realtor, owed duty to prospective purchaser he directly communicated with); *Pastor v. Lafayette Bldg. Ass'n*, 567 So.2d 793, 796 (La. App. 3 Cir. 1990) (first mortgagee had no preexisting duty to second mortgagee, however, "once it volunteered the information [directly to plaintiff], it assumed a duty to insure that the information volunteered was correct."); *see also Kent v. Cobb*, 811 So. 2d 1206, 1212 (La. App. 2 Cir. 2002), *writ denied sub nom. Doug v. Cobb*, 818 So. 2d 772 (La. 2002) ("Where privity of contract is absent, but there is communication of the misinformation by the tort-feasor directly to the user or the user's agent, the user is owed a tort duty.").

By speaking directly to Hasselman, Legacy assumed a duty to avoid negligently misrepresenting the vessel's capabilities. Legacy's negligent misrepresentation arguments therefore lack merit.

### 3. Damage to the 41' Ex USGG UTB #41440

In addition to IMSE's claims regarding the sale of the Legacy Server, IMSE brings a claim for damage to another vessel, the 41' Ex USGG UTB #41440.[65]   IMSE brokered the sale of UTB #41440 on behalf of another client, Costa Fortuna.   According to Hasselman, Costa Fortuna billed him $4,000 for the cost of repairs.[66]   Hasselman alleges that the Legacy Server and UTB #41440 were being transported together when UTB #41440 was damaged.[67]

This Court has a duty to police its own jurisdiction, and is required to dismiss *sua sponte* any action over which it lacks jurisdiction. *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982).   Under Rule 13 of the Federal Rules of Civil Procedure counterclaims may be compulsory or permissive.   If IMSE's counterclaim is permissive, and IMSE's damages are only $4,000, then the claim must be dismissed for failure to meet the amount-in-controversy requirement of 28 U.S.C. § 1332.   *See Weber v. Lincoln Nat. Life Ins. Co.,* No. 13-31, 2013 WL 5530257, at *5 (E.D. Va. Oct. 2, 2013), *aff'd sub nom. Weber v. Oliver*, 575 F.

---

[65]      R. Doc. 23 at 3.

[66]      R. Doc. 64-4 at 2.

[67]      R. Doc. 23 at 3.

App'x 162 (4th Cir. 2014); 6 Wright & Miller, *Federal Practice and Procedure* § 1423 (3d ed. 2016).

A counterclaim is compulsory if it "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and . . . does not require adding another party over whom the court cannot acquire jurisdiction." Fed. R. Civ. P. 13(a). All counterclaims that are not compulsory are permissive. *Id.* The Fifth Circuit has articulated a four-part test for determining whether a counterclaim is compulsory:

> (1) whether the issues of fact and law raised by the claim and counterclaim largely are the same; (2) whether *res judicata* would bar a subsequent suit on defendant's claim absent the compulsory counterclaim rule; (3) whether substantially the same evidence will support or refute plaintiff's claim as well as the defendant's counterclaim; and (4) whether there is any logical relationship between the claim and the counterclaim. An affirmative answer to any of the four questions indicates the claim is compulsory.

*Underwriters at Interest on Cover Note JHB92M10582079 v. Nautronix, Ltd.*, 79 F.3d 480, 483 n.2 (5th Cir. 1996). The Court concludes that under this test, IMSE's counterclaim regarding UTB #41440 is permissive.

The UTB #41440 counterclaim involves issues of fact and law that are substantially different from those at issue in Legacy's claims against IMSE. Every other claim in this case raises issues of misrepresentation and warranty surrounding the sale of the Legacy Server. This counterclaim, by contrast, concerns damage to another boat, brokered by Hasselman for

another buyer, that simply happened to be transported with the Legacy Server. The issues of fact at the core of the primary claims—whether Legacy misrepresented the Legacy Server—are irrelevant to the UTB #41440 claim. Similarly, all factual issues regarding the transportation of UTB #41440 and the related agreement between Hasselman, Costa Fortuna, and Legacy are irrelevant to the other claims in this case. Because the claims concern different facts, they require different evidence. Moreover, these factual and legal distinctions ensure that *res judicata* would not bar a later claim by IMSE for damage to UTB #41440, *see Ellis v. Amex Life Ins. Co.*, 211 F.3d 935, 937 (5th Cir. 2000) (describing *res judicata* test), and undermine any contention that there is a "logical relationship" between the primary claims and this counterclaim.

For these reasons, IMSE's counterclaim concerning UTB #41440 is permissive, rather than compulsory. Under 28 U.S.C. § 1332, this Court lacks jurisdiction over a permissive counterclaim that does not meet the amount in controversy requirement. By Hasselman's own admission, the cost of repairing UTB #41440 was only $4,000. IMSE's counterclaim for damage to UTB #41440 must therefore be dismissed.

## IV.   CONCLUSION

For the reasons above, the Court DENIES Legacy's motion for summary judgment on Nautimill's claims for fraudulent misrepresentation, negligent misrepresentation, and redhibition.  The Court GRANTS Legacy's motion for summary judgment on Nautimill's claims for breach of the warranty of fitness for ordinary use and breach of contract.  The Court DENIES Legacy's motion for summary judgment on IMSE and Hasselman's counterclaims for lost commission on the sale of the Legacy Server. Finally, the Court dismisses IMSE and Hasselman's counterclaims regarding damage to UTB #41440 for lack of jurisdiction, and therefore DENIES AS MOOT Legacy's motion for summary judgment on the same claim.

New Orleans, Louisiana, this  7th  day of July, 2016.


_____

SARAH S. VANCE
UNITED STATES DISTRICT JUDGE