UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

NAUTIMILL S.A.                                        CIVIL ACTION

VERSUS                                               NO: 15-1065

LEGACY MARINE                                        SECTION: R(5)
TRANSPORTATION, LLC

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## I.      INTRODUCTION

This dispute arises out of Nautimill S.A.'s purchase of the pushboat M/V LEGACY SERVER from Legacy Marine Transportation, LLC, a Louisiana limited liability company,[1] in April 2014.  Nautimill, a Uruguayan corporation,[2] sued Legacy on April 3, 2015, alleging that Legacy misled Nautimill and Nautimill's Florida-based[3] agent David Hasselman about the condition of the Legacy Server before the purchase.[4]  On July 7, 2016 the Court granted partial summary judgment in favor of Legacy.[5]  Following that

---

[1]     R. Doc. 83 at 2.
[2]     *Id.* at 1.
[3]     *Id.* at 2.
[4]     R. Doc. 1.
[5]     R. Doc. 82.

ruling, Nautimill retained claims for fraudulent misrepresentation, negligent misrepresentation, and breach of the warranty against redhibitory defects.[6]

In response to Nautimill's claims, Legacy filed a third party complaint against Hasselman and his Florida limited liability company,[7] International Marine Sales and Export, LLC (IMSE), seeking indemnity and damages.[8] Hasselman and IMSE have also filed counterclaims against Legacy.[9]  After partial summary judgment, Hasselman and IMSE maintained claims for fraudulent and negligent misrepresentation.[10]

On July 18-19, 2016 the Court held a bench trial.  Hasselman waived his opportunity to present evidence during the trial.  The Court has diversity jurisdiction over this case under 28 U.S.C. § 1332 because the parties are citizens of different states, including a foreign state, and the matter in controversy exceeds $75,000.  The Court has previously determined that the claims in this case are governed by Louisiana law.[11] After hearing live testimony and reviewing the evidence, the Court rules as follows.

---

[6] *Id.*

[7] *Id.* at 2.

[8] R. Doc. 13.

[9] R. Doc. 23.

[10] R. Doc. 82.

[11] *Id.*

## II.    FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A.    Background

#### 1.  Nautimill's Search for a Pushboat

Nautimill is in the business of transporting barges along the rivers of Uruguay.[12]  In late 2013, the company sought to purchase an additional pushboat.[13]  As part of its search, Nautimill contacted Hasselman,[14] an experienced vessel broker.[15]  Ruben Varela, the president of Nautimill, specified to Hasselman that he was looking for a new,[16] 2,000 horsepower pushboat.[17]  After speaking with Varela, Hasselman set out to find a vessel that met Nautimill's needs.[18]  He soon identified the M/V LEGACY SERVER as a suitable candidate.[19]

The Legacy Server was built by R&R Boats, an affiliated entity of Legacy.  R&R began constructing the Legacy Server in late 2012 from an unused, partially complete hull it had purchased earlier that year.[20]  R&R

---

[12]     Testimony of Ruben Varela.
[13]     Joint Ex. 1; testimony of Ruben Varela.
[14]     Joint Ex. 1.
[15]     Testimony of David Hasselman; testimony of Ruben Varela; testimony of Robert Boudreaux, Sr.
[16]     Testimony of David Hasselman; testimony of Ruben Varela.
[17]     Joint Ex. 2.
[18]     Testimony of David Hasselman.
[19]     *Id.*
[20]     Uncontested Material Facts 18; Joint Ex. 57.

outfitted the Legacy Server with reconditioned engines,[21] which had been rebuilt in-house at R&R from used, Caterpillar-brand engine blocks.[22]  The reconditioned engines did not have engine tags.[23]  The marine gears and starboard propeller that R&R installed on the Legacy Server were also reconditioned.[24]

On November 14, 2013, Hasselman emailed Varela with details about the Legacy Server. Hasselman's email described the vessel as a "BRAND NEW Tug" with "Twin Cat[erpillar] 3412 [engines] rated 1,000 Hp each."[25] It further stated that the vessel had been used only for "Sea Trail [sic.] hours (8 hours time)" and came with a "1 Year Warranty on all equipment and the Hull, Deck, and Paint Work."[26]  The email listed a purchase price of "$2,200,000.00 USD FIRM."[27]

The parties agree that these specifications are not accurate.  Robert Boudreaux, Sr. and Robert Boudreaux, Jr. both testified that the Legacy Server's engines produce 800, rather than 1,000, horsepower each.[28]  The

---

[21]     Uncontested Material Facts 6.
[22]     Uncontested Material Facts 7.
[23]     Testimony of Ruben Varela; testimony of Robert Boudreaux, Sr.
[24]     Uncontested Material Facts 9, 10.
[25]     Joint Ex. 3.
[26]     *Id.*
[27]     *Id.*
[28]     Testimony of Robert Boudreaux, Sr.; testimony of Robert Boudreaux, Jr.

800 horsepower figure is reflected in advertisements for the Legacy Server placed by Legacy on R&R Boats' website and in Boats & Harbor Magazine, an industry periodical.[29]  The website listing, which Boudreaux, Sr. testified was placed in January, 2014,[30] states that the vessel is a "new build" with engines producing 800 horsepower each.[31]  The Boats & Harbor advertisement, which ran in March, 2014, describes the vessel as a "1600 HP PUSHBOAT, 2013 (New Build)" and listed a $2.1 million asking price.[32]

## 2. The Inspection

On February 4, 2014, Hasselman emailed Varela to say that Hasselman would be in Louisiana to inspect and sea trial a potential purchase on behalf of another client.[33]  At Varela's behest, Hasselman arranged an inspection and sea trial of the Legacy Marine.[34]  The inspection was conducted by two Uruguayan naval officers, Captain Jose Perez Castro and Edgardo Costa.[35]  As part of the inspection, Hasselman and the Uruguayan officers visited the engine room and travelled some distance aboard the vessel.[36]   Both

---

[29]     Joint Ex. 31, 32.
[30]     Testimony of Robert Boudreaux, Sr.
[31]     Joint Ex. 31.
[32]     Joint Ex. 32.
[33]     Joint Ex. 4.
[34]     Uncontested Material Facts 24; testimony of David Hasselman; testimony of Ruben Varela.
[35]     Uncontested Material Facts 24.
[36]     Testimony of Robert Boudreaux, Sr.; testimony of David

Hasselman and Perez Castro testified that, at the time of the inspection, the engines appeared new.[37]  Both men also testified that they did not notice that the engines lacked identification plates.[38]

### 3. The Purchase

On March 17, 2014, Boudreaux, Sr. emailed Hasselman to say Legacy had several potential charter opportunities for the Legacy Server, but would prefer to sell the vessel.[39]  Boudreaux, Sr. requested that the parties set a firm date for Legacy to receive a non-refundable deposit.[40]   On March 25, Hasselman sent Legacy a deposit on Nautimill's behalf,[41] and the parties executed a "Vessel Purchase Agreement" prepared by Hasselman.[42]   The Agreement states that "[t]he vessel (s) and all her tackle apparel, gear, machinery, equipment and furnishings are sold AS IS, WHERE IS, without warranties of merchantability or fitness for any particular use" and that "the buyer hereby accepts the vessel (s) on an AS IS, WHERE IS BASIS."[43]   The

---

Hasselman.
    [37]    Deposition of Captain Jose Perez Castro, June 7, 2016, 62:2-9; testimony of David Hasselman.
    [38]    Deposition of Captain Jose Perez Castro, June 7, 2016, 62:10-12; testimony of David Hasselman.
    [39]    Joint Ex. 9.
    [40]    *Id.*
    [41]    Joint Ex. 12.
    [42]    Uncontested Material Facts 25.
    [43]    Joint Ex. 58 at 2.

Agreement also lists under "Terms and Conditions" that "Main engine(s) and Generator to be in proper working condition" and that "Buyer or their representatives have had previous inspect and sea trial of the vessel and found it suitable to their needs."[44]   The Agreement provides no details regarding the age or power of the vessel's engines.[45]

On March 28, 2014, three days after completing the Vessel Purchase Agreement, Nautimill co-owner Carlos Schinoni emailed Hasselman and said "David: our spare surveyor told us the engines are old.  They are not made since 1990.  It's true?"[46]  That same day, Hasselman emailed Legacy to request serial numbers for the Legacy Server's engines and generators.[47]  In the email, Hasselman stated that he needed the serial numbers to research spare parts.[48]  Legacy emailed serial numbers to Hasselman on March 31, 2014.[49]

---

[44]      *Id.* at 3.

[45]      *Id.* at 1-3.

[46]      Uncontested Material Facts 26.  Hasselman testified that he found no reply to this email in his records.  Testimony of David Hasselman.

[47]      Joint Ex. 12.

[48]      *Id.*

[49]      Joint Ex. 13.  In his testimony, Boudreaux, Sr. asserted that, although these serial numbers were sent in an email chain concerning the Legacy Server, they corresponded to unrelated engines Hasselman and Boudreaux, Sr. had discussed over the telephone.  The Court finds Boudreaux, Sr.'s account implausible and does not credit it.

In April, 2016 Legacy completed a U.S. Coast Guard bill of sale.[50]  A draft version of the bill of sale, prepared by Legacy, stated that the Legacy Server was "BEING SOLD 'AS IS WHERE IS' WITHOUT REPRESENTATION OF WARRANTY OF ANY KIND WHATSOEVER BY SELLER, EXPRESSED OR IMPLIED."[51]  Although this language matched Hasselman's Vessel Purchase Agreement, Hasselman emailed Legacy to say that the "as is" warranty language in the draft bill of sale was inconsistent with the parties' agreement.[52]  Hasselman insisted that "[t]he arrangement was that the equipment is under warranty by the various manufacturers and [Legacy] would warranty vessel construction and workmanship but [] would not travel to do so."[53]  Legacy agreed to the change, and an updated bill of sale was executed on April 29, 2014.[54]  The executed bill of sale states: "EQUIPMENT WARRANTED BY THE VARIOUS MANUFACTURERS. ONE YEAR WARRANTY ON VESSEL CONSTRUCTION AND WORKMANSHIP ADDRESSED LOCALLY FOR CORRECTIVE ACTION AND COSTS TO BE AGREED UPON BEFORE UNDERTAKING.  ALL WARRANTIES DO NOT COVER ANY FAILURES WHATSOEVER FOR

---

[50]     Joint Ex. 37.
[51]     Joint Ex. 35.
[52]     Joint Ex. 15.
[53]     *Id.*
[54]     Uncontested Material Facts 13.

8

FAILURE TO MAINTAIN, NEGLECT, MISUSE, OR NORMAL WEAR AND TEAR."[55]

Following completion of the bill of sale, Legacy transported the vessel to Houston, where it was loaded onto a larger ship for the trip to South America.[56]   The Legacy Server arrived in Uruguay on or about May 25, 2014.[57]

### 4. Nautimill is disappointed by the Legacy Server

Captain Jose Maran, a Nautimill employee, met the Legacy Server when it arrived in Uruguay aboard the transport ship.[58]  Maran testified that before the boat was unloaded into the water, he noticed that the Legacy Server's propellers were different shapes.[59]   Shortly thereafter, Uruguayan authorities inspected the vessel as part of the requirements for registering it under the Uruguayan flag.[60]   According to Varela, it was the Uruguayan

---

[55]     Joint Ex. 37.
[56]     Uncontested Material Facts 30, 31.  While the Legacy Server was being loaded onto the transport ship, the cradle used to lift the vessel snapped and the vessel fell some distance into the water below.  Uncontested Material Facts 32.  No party submitted evidence suggesting that the vessel was damaged by the drop.
[57]     Uncontested Material Facts 33.
[58]     Testimony of Captain Jose Maran.
[59]     *Id.*
[60]     Testimony of Ruben Varela.

inspectors who first discovered that the engines lacked identification plates.[61]

On June 18, 2014, Hasselman obtained engine reports from Caterpillar based on the serial numbers Legacy had emailed him on March 31.[62] According to the reports, the serial numbers provided by Legacy matched engines producing 625 and 540 horsepower respectively.[63] In order to permit the vessel to pass inspection, Hasselman prepared, at Nautimill's request, engine identification plates based on the serial numbers provided by Legacy.[64]

The Legacy Server began work as a pushboat in July 2014,[65] earning Nautimill $4,000 per day.[66] According to Varela, a 2,000 horsepower vessel would have earned Nautimill $8,000 per day, but the company was forced to accept the lower rate because it did not know the true power output of the Legacy Server's engines.[67]

On January 23, 2015 Hasselman contacted Legacy and advised them that Nautimill had requested a meeting to discuss complaints concerning the

---

[61]  *Id.*
[62]  Joint Ex. 27.
[63]  *Id.*
[64]  Testimony of David Hasselman; testimony of Ruben Varela.
[65]  Uncontested Material Facts 35.
[66]  Testimony of Ruben Varela.
[67]  *Id.*

Legacy Server.[68]  The parties met at Legacy's office the next day.[69]  Nautimill and Legacy were unable to amicably resolve their dispute, and this suit followed in April, 2015.

Two months after filing suit, Nautimill placed the Legacy Server in dry dock.[70]  Norman Dufour, a marine surveyor, inspected the vessel while it was out of the water.[71]  Varela testified that he observed Dufour examining the Legacy Server's engines.[72]  Dufour showed Varela that one of the engine blocks displayed a legible serial number, but the other engine's number had been scratched away and was illegible.[73]

There are two principal fact issues that must be resolved by the Court: 1) whether Legacy represented the Legacy Server's engines to be new, 1,000 horsepower engines, and 2) what the physical condition of the Legacy Server was at the time of delivery.  For the reasons outlined below, the Court finds that Nautimill has failed to meet its burden to show that the 1,000 horsepower representations originated with Legacy, rather than Hasselman. The Court further finds that at the time of delivery, the vessel's engines

---

[68]    Uncontested Material Facts 36.

[69]    Uncontested Material Facts 37.

[70]    Joint Ex. 89; testimony of Ruben Varela.

[71]    Testimony of Ruben Varela.

[72]    *Id.*

[73]    *Id.*

produced approximately 600 horsepower each, but that the propellers and other equipment were in working condition.

### B.    Whether Legacy Represented the Legacy Server's Engines To Be New, 1,000 Horsepower Engines

Nautimill contends that Legacy falsely portrayed the Legacy Server as outfitted with two new, 1,000 horsepower engines.  Legacy asserts that it specifically told Hasselman several times that the engines were rebuilt and produce 800 rather, than 1,000 horsepower.

It is undisputed that Nautimill and Legacy never spoke directly; all communication went through Hasselman or the Uruguayan naval officers.[74] Hasselman's November 14, 2013 email to Varela described the vessel as a brand new, 2,000 horsepower pushboat.[75]   There is no evidence that Nautimill ever received corrected specifications.   The parties, however, dispute where the incorrect information originated: Nautimill blames Legacy; Legacy blames Hasselman.

Robert Boudreaux, Sr. and Robert Boudreaux, Jr. both testified that they told Hasselman the engines were reconstructed, 800 horsepower engines several times.  Boudreaux, Jr. testified in detail about the three times he met Hasselman.[76]   Boudreaux, Jr. stated that the first meeting occurred

---

[74]    Testimony of Ruben Varela; testimony of Robert Boudreaux, Sr.
[75]    Joint Ex. 3.
[76]    Testimony of Robert Boudreaux, Jr.

in January 2013, when Hasselman visited Legacy's yard.[77]  During that visit,
Boudreaux, Jr. showed Hasselman the Legacy Server's then-unfinished
engines.[78]  Boudreaux, Jr testified that he and Hasselman stood next to the
engines and discussed the rebuild process that R&R was performing.[79]  One
of the two engines was obviously mid-rebuild, and parts of the engine were
lying on the floor surrounding it.[80]  According to Boudreaux Jr., Hasselman
asked detailed questions about the engines, including questions about the
rebuild process itself.[81]  Boudreaux Jr. testified that during this discussion
he told Hasselman that the engines produced 800 horsepower at 1,800
rpm.[82]

Hasselman visited Legacy's yard a second time, in May 2013, and
toured both the Legacy Server and another pushboat, the 2,000 horsepower
Legacy Provider.[83]  According to Boudreaux, Jr, the tour was extensive,
covering everything from the wheelhouse to the engine room.[84]  Boudreaux,
Jr. testified that he told Hasselman during this tour that the Legacy Server

---

[77]  *Id.*
[78]  *Id.*
[79]  *Id.*
[80]  *Id.*
[81]  *Id.*
[82]  *Id.*
[83]  *Id.*
[84]  *Id.*

produced 1,600 horsepower, and that the vessel was equipped with the 800 horsepower engines Hasselman had seen under construction during his last visit.[85]   Finally, Boudreaux Jr. testified that Hasselman visited Legacy's yard for a third time in March 2014 to view a pair of engines for another client.[86] On that visit Boudreaux, Jr. once again described the Legacy Server as a 1,600 horsepower tug.[87]

Robert Boudreaux, Sr. corroborated his son's testimony regarding Hasselman's visits to the Legacy yard in January and May of 2013.[88] Boudreaux, Sr. stated that Hasselman was told that the Legacy Server's engines produce 800 horsepower on both visits, and was also informed that the vessel's gears were remanufactured.[89]   Boudreaux, Sr. also described the February, 2014 inspection by Hasselman and the Uruguayan naval officers. Boudreaux, Sr. testified that during the sea trial, Hasselman himself told the Uruguayans that the Legacy Server was a 1,600 horsepower vessel, and that Boudreaux, Sr. agreed.[90]   Boudreaux, Sr. also stated that during the inspection he told one of the Uruguayan officers that the engines were

---

[85]   *Id.*
[86]   *Id.*
[87]   *Id.*
[88]   Testimony of Robert Boudreaux, Sr.
[89]   *Id.*
[90]   *Id.*

reconditioned.[91]   Finally, Boudreaux, Sr. testified that he told Hasselman, prior to the signing of the final bill of sale, that most or all of the manufacturer warranties on the Legacy Server's component parts were expired or close to expiring.[92]

Hasselman disputed the Boudreauxs' account.   First, Hasselman asserted that he obtained the specifications in his November 14, 2013 email from Legacy.[93]   Second, Hasselman testified that during the February, 2014 inspection one of the Uruguayan officers—he could not recall which—asked Boudreaux, Sr. for confirmation that the engines were 1,000 horsepower, and Boudreaux, Sr. answered affirmatively.[94]   Captain Perez Castro, one of the Uruguayan naval officers, partially corroborates this account.[95]

The Court finds that Hasselman's testimony on this point is not credible for several reasons.   First, Hasselman could give no specifics about where he obtained the information contained in his initial email to Varela, beyond that the information was probably conveyed to him orally, and that this conversation may have occurred over the telephone.[96]   Second, although

---

[91]   *Id.*
[92]   *Id.*
[93]   Testimony of David Hasselman.
[94]   *Id.*
[95]   Deposition of Captain Jose Perez Castro, June 7, 2016, 63:19-65:9.
[96]   Testimony of David Hasselman.

Captain Perez Castro also states that Boudreaux, Sr. claimed the engines produced 1,000 horsepower during the inspection, in Perez Castro's account Hasselman, not one of the Uruguayans, asked Boudreaux, Sr. about the engines.[97] This disagreement on the key point of who asked about horsepower significantly curtails the persuasive force of the two men's testimony.[98]

Third, the evidence before the Court gives rise to serious doubts concerning Hasselman's general veracity. Hasselman executed an affidavit on July 20, 2015, concerning the facts at issue in this case.[99] The affidavit plainly contradicts his testimony on several points. Most glaringly, the affidavit states that during the February 2014 inspection "it was noted the engine plates showing the serial numbers of the engines were missing," and "Legacy Marine/Boudreaux promised the plates would be installed before the vessels were transported to Uruguay."[100] In contrast, Hasselman testified at trial that he never noticed that the Legacy Server's engines lacked plates.[101] The Court finds Hasselman's attempt to blame these misstatements on the

---

[97]    Deposition of Captain Jose Perez Castro, June 7, 2016, 63:19-65:9.
[98]    This testimony is also contradicted by Captain Roy Pena, in addition to the Boudreauxs. Testimony of Captain Roy Pena.
[99]    Joint Ex. 82.
[100]    *Id.* at 2.
[101]    Testimony of David Hasselman.

attorney who prepared the affidavit unconvincing, especially because emails between Hasselman and the attorney suggest that Hasselman reviewed the affidavit closely enough to fill in a blank date field at the beginning of the specific paragraph concerning the engine plates.[102]

Hasselman's actions surrounding his commission on the sale of the Legacy Server further undermine his credibility.  According to Varela's testimony and emails between the parties, Hasselman and Varela agreed that, because the Legacy Server had a much higher sales price than other vessels Nautimill had bought through Hasselman, Hasselman's usual ten percent commission was too high.[103]  Hasselman stated that he would instead "handle it for 5% of the sales price," or $110,000.[104]  This figure, according to Hasselman, represented "a 50% reduction based on our long term business and the high value of the vessel."[105]  What Varela did not know, is that Hasselman had inflated the price of the vessel from $2.1 million to $2.2 million and kept the $100,000 difference for himself.[106]  Unaware of the

---

[102]     Joint Ex. 83 at 9 (email from Hasselman stating "I was able to obtain the ACTUAL dates via my records").

[103]     Joint Ex. 5; testimony of Ruben Varela.

[104]     Joint Ex. 5.

[105]     *Id.*

[106]     Testimony of Ruben Varela; Joint Ex. 10.

initial payment, Varela agreed to pay Hasselman an additional $120,000 in monthly, $10,000 installments.[107]

For these reasons, the Court does not credit Hasselman or Captain Perez Castro's testimony on the issue of Legacy's pre-sale representations. Because Nautimill offers no other evidence tending to show that Legacy represented the Legacy Server as having new, 1,000 horsepower engines, the Court finds that Nautimill has failed to meet its burden of proof on this point.

### C.   The Physical Condition of the Legacy Server at the Time of Delivery

The second major factual issue before the court concerns the physical condition of the Legacy Server at the time of delivery.  Here, the parties agree on much.  It is undisputed that: (1) the Legacy Server's engines and marine gears were reconditioned, rather than new;[108] (2) the port propeller was new and the starboard propeller was used;[109] (3) the propellers had different disc area ratios (DARs);[110] and (4) neither the engines themselves, nor their component parts were under warranty.[111]  The parties disagree, however, on the horsepower produced by the vessel's engines and whether the difference

---

[107]   Testimony of Ruben Varela.
[108]   Uncontested Material Facts 9, 36.
[109]   Uncontested Material Facts 10.
[110]   Uncontested Material Facts 11.
[111]   Testimony of Robert Boudreaux, Sr.; testimony of Ruben Varela.

between the two propellers affects the vessel's performance. The Court finds, for the reasons that follow, that the Legacy Server's engines produced approximately 600 horsepower each at the time of delivery, but that any difference between the two propellers is insignificant and causes no operational difficulties.

In support of its claim that the Legacy Server's engines are underpowered, Nautimill relies chiefly on expert Wayne Wingate. In his testimony, Wingate opined that the Legacy Server's engines do not produce 1,000, or even 800, horsepower.[112] Wingate based his testimony on a test performed by Frank & Jimmie's Propeller, a company hired by Nautimill to test the horsepower of the Legacy Server's engines.[113] Frank & Jimmie's administered a strain gauge test and found that the maximum horsepower produced by the port and starboard engines was 591 horsepower and 614 horsepower respectively.[114] Wingate performed independent calculations that supported the validity of the Frank & Jimmie's test, and opined that a strain gauge test is the most accurate test for determining the true maximum output of an installed engine.[115] Wingate further testified that a dock push

---

[112]   Testimony of Wayne Wingate.
[113]   Testimony of Ruben Varela; testimony of Wayne Wingate.
[114]   Testimony of Wayne Wingate.
[115]   *Id.*

test, which Legacy used to test the Legacy Server's horsepower prior to the sale, is a significantly less accurate test.[116]  Wingate stated that the accuracy of a dock push test depends on having a properly calibrated tachometer, and that the Frank & Jimmie's report indicated that the Legacy Server's tachometer was not properly calibrated.[117]  Wingate conceded, however, that the Frank and Jimmie's report was prepared more than a year after Legacy's dock push test.[118]  Wingate further conceded that if the engines had actually achieved 1800 revolutions per minute (rpm) during a dock push test, that would suggest the engines can in fact produce 800 horsepower each.[119]

At trial, Legacy argued that its own dock push test—performed in June or July 2013[120]—is a more reliable indicator of the vessel's capabilities at the time of sale.  Robert Boudreaux, Sr., Robert Boudreaux, Jr., and Dylan Boudreaux all testified that the vessel achieved approximately 1785 rpm during the dock push test.[121]  Boudreaux, Jr. testified that the rpm

---

[116]  *Id.*
[117]  *Id.*
[118]  *Id.*
[119]  *Id.*
[120]  Testimony of Robert Boudreaux, Sr.
[121]  Testimony of Robert Boudreaux, Sr.; testimony of Robert Boudreaux, Jr.; testimony of Dylan Boudreaux.

measurement was obtained with a handheld tachometer,[122]  which Wingate agreed is an accurate tool for measuring rpm.[123]

Legacy's expert, John Jay Webster, contested the validity of the Frank & Jimmie's test.  Webster opined that several factors not described in the Frank & Jimmie's report could have caused the test to underestimate the engines' potential power output.[124] These factors included dirty aftercoolers and turbochargers, dirty air and fuel filters, fuel line or water restrictions, water depth, weather, and location.[125]

Faced with two conflicting tests, the Court finds that Legacy's dock push test is unreliable for several reasons.  First, the Court credits Wayne Wingate's undisputed assertion that the true torque test is far more accurate than the dock push test.  Second, the Court finds that the persuasive weight of Legacy's test is undermined by Legacy's failure to produce any written documentation memorializing the circumstances of the test or the test's results.  Third, Webster's opinion that several environmental and engine factors may have affected the Frank & Jimmies results is undercut by Varela's credible testimony. Varela testified that the Frank & Jimmies test was

---

[122]    Testimony of Robert Boudreaux, Jr.
[123]    Testimony of Wayne Wingate.
[124]    Testimony of John Jay Webster.
[125]    *Id.*

performed in a protected bay, in eight to ten meters of water, under calm sea and wind conditions.[126]  He further testified that Nautimill later had the engine turbochargers cleaned, and that this procedure caused no change in the vessel's performance.[127]  The Court therefore credits the results of the Frank & Jimmie's true torque test and finds that the Legacy Server's engines produced a maximum of approximately 600 horsepower each at the time of sale.

The Court, however, finds no credible evidence that the engines installed in the Legacy Server produce meaningfully different levels of power. Although the Frank & Jimmies test found a 23 horsepower difference between the two engines, Wingate conceded that this number fell within the test's margin of error.[128]  Furthermore, Nautimill offered no evidence tending to show that this difference, even if not explained by the margin of error, is significant enough to affect the performance of the vessel.

Finally, the Court finds for several reasons that the evidence does not support Nautimill's assertion that differences between the Legacy Server's propellers affect the vessel's performance.  Varela and Maran testified that

---

[126]    Testimony of Ruben Varela.
[127]    *Id.*
[128]    Testimony of Wayne Wingate.

differences in the propellers cause the vessel to pull to one side.[129]  The Court finds that the two men are self-interested on this point, and that their testimony is contradicted by convincing evidence that the propellers had no negative operational effect.

There are several indications that the vessel's propellers cause no operational problems.   First, Hasselman and the Uruguayan officers reported no problems during the pre-purchase sea trial of the vessel.[130] Second, Captain Roy Pena convincingly testified that he delivered the vessel from Legacy's yard to Houston and experienced no problems during the nearly 40 hour journey.[131]  Finally, Webster, Legacy's expert, testified that he had performed calculations on the relative efficiency of the vessel's propellers.[132]  Based on these calculation, Webster convincingly opined that the difference between the propellers installed on the vessel is insignificant.[133]

---

[129]    Testimony of Ruben Varela; testimony of Captain Jose Maran.
[130]    Testimony of David Hasselman; deposition of Captain Jose Perez Castro, June 7, 2016, 97:1-22; testimony of Ruben Varela.
[131]    Testimony of Captain Roy Pena.
[132]    Testimony of John Jay Webster.
[133]    *Id.*

For these reasons, the Court finds that at the time of delivery, the Legacy Server's engines produced approximately 600 horsepower each, but that the vessel was otherwise a fully operational pushboat.

### D.   Whether the Legacy Server Possessed a Redhibitory Defect at the Time of Sale

As noted above, the Court finds that Nautimill failed to show at trial that Legacy mischaracterized the Legacy Server as a 2,000 horsepower vessel.  Legacy concedes, however, that the Legacy Server was sold as a 1,600 horsepower vessel.[134]  Because the Court finds that the Legacy Server in fact produced only approximately 1,200 horsepower the Court must determine whether this defect rises to the level of being redhibitory.

Under the Louisiana law of redhibition, a "seller warrants the buyer against redhibitory defects, or vices, in the thing sold."  La. Civ. Code art. 2520.  A defect is redhibitory when it either (1) "renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect"; or (2) "diminishes its usefulness or its value so that it must be presumed that a buyer would still have bought it but for a lesser price."  *Id.*  The former entitles the buyer to recession of the sale, while the latter gives rise only to a claim for reduction

---

[134]    Testimony of Robert Boudreaux, Sr.; testimony of Robert Boudreaux, Jr.

of the purchase price.  *Id.*  The existence of a redhibitory defect is a question of fact.  *Hatten v. Estes Cadillac, Inc.*, 625 F. Supp. 913, 916 (E.D. La. 1986) (citing *Newman v. Dixie Sales & Service*, 387 So. 2d 1333, 1339 (La. App. 1 Cir. 1980)).

As an initial matter, the Court finds that the defects present in the Legacy Server have not rendered the vessel useless.  A thing is generally not useless under redhibition if the buyer has been able to put it to productive, trouble-free use.  *See, e.g., Pardue v. Ryan Chevrolet, Inc.*, 719 So. 2d 623, 627 (La. App. 2 Cir. 1998), *writ denied*, 734 So. 2d 639 (La. 1998) (upholding trial court's holding "that since the plaintiff continued to drive the vehicle on a regular basis, the defect in the vehicle did not merit a rescission of the sale").  As noted above, the Legacy Server has been in service as a pushboat for two years, earning Nautimill $4,000 per day.[135]  Varela testified that the Legacy Server has required only minor repairs and that the vessel's engines have suffered only routine problems.[136]  Furthermore, the Court cannot say on the evidence before it that Nautimill would not have purchased the vessel had the defect been disclosed.  As noted above, Nautimill has failed to show that Hasselman was accurately conveying Legacy's representations to

---

[135]   Uncontested Material Facts 35; testimony of Ruben Varela.
[136]   Testimony of Ruben Varela.

Nautimill. There is therefore no compelling evidence that an accurate description of the defect to Hasselman—as opposed to Nautimill—would have prevented the sale.

The Court finds, however, that the defects in the Legacy Server diminished the vessel's value such that it must be presumed that a buyer would have paid a lesser price. The evidence before the Court strongly supports a finding that total engine power is a key pushboat attribute. In Varela's initial email to Hasselman, Varela specified only the horsepower he was looking for.[137] Varela testified, consistent with common sense, that greater engine horsepower allows a pushboat to push heavier loads.[138] Varela's testimony was also consistent with the general notion that more powerful pushboats earn higher rental rates.[139] Furthermore, Robert Boudreaux, Jr. testified that the two most important attributes to convey when discussing a pushboat are its size and the power of its engines.[140] This testimony is buttressed by the language of Legacy's advertisement in Boats & Harbor magazine, which begins by describing the vessel as a "1600 HP PUSHBOAT".[141] The Court finds that, given the evident importance of engine

---

[137]     Joint Ex. 1.
[138]     Testimony of Ruben Varela.
[139]     *Id.*
[140]     Testimony of Robert Boudreaux, Jr.
[141]     Joint Ex. 32.

power, it is a reasonable inference that a buyer would pay less for a vessel producing only 75 percent of its advertised horsepower.  Accordingly, the Court finds that the Legacy Server possessed a redhibitory defect at the time of sale.

### E.    Whether a "Simple Inspection" Would Have Revealed the Legacy Server's Defective State

In order to recover in redhibition, Nautimill must show that the defects described above were not discoverable by simple inspection.  A seller "owes no warranty for defects in the thing that were known to the buyer at the time of the sale, or for defects that should have been discovered by a reasonably prudent buyer of such things."  La. Civ. Code art. 2521.  To determine whether a defect should have been discovered, "courts consider whether a reasonably prudent buyer, acting under similar circumstances, would discover it through a simple inspection of the thing sold."  *Spraggins v. Lambeth*, 973 So. 2d 165, 167 (La. App. 2 Cir. 2007).  A "simple inspection" requires "more than casual observance," *id.*, but "[t]he buyer is under no obligation . . . to inspect with expertise or to deface the thing purchased while inspecting it."  *Jones v. Wells Fargo Bank, N.A.*, 626 F. App'x 500, 504 (5th Cir. 2015) (quoting *McGough v. Oakwood Mobile Homes, Inc.*, 779 So. 2d 793, 801 (La. App. 2 Cir. 2000)); *see also Amend v. McCabe*, 664 So. 2d 1183, 1188 (La. 1995) (holding that, in the context of termite damage, when all of

27

the damage "is concealed within the home's structure (*e.g.*, walls and floors) it is considered unapparent because it is not discoverable by a simple inspection").

The Court finds that the Legacy Server's defects were not discoverable by simple inspection. Wayne Wingate testified at length regarding the different methods for testing horsepower.[142]  Each of these methods require considerable effort and expertise, and the simple inspection standard does not oblige a buyer to exhaust all available avenues of assessing the purchased thing's soundness.  *See Crow v. Laurie*, 729 So. 2d 703, 708 (La. App. 1 Cir. 1999) ("[A]lthough the trial court correctly determined the Crows were required to inspect the boat, it committed legal error by imposing upon the Crows a duty to perform a more extensive inspection than a 'simple inspection' . . . ."); *Buck v. Adams*, 446 So. 2d 895, 898 (La. App. 1 Cir. 1984) (holding that the simple inspection standard does not "require[] one to dry-dock a boat to check its seaworthiness.").  The Court therefore finds that the Legacy Server's defects were not discoverable by simple inspection, and article 2521 has no effect on Nautimill's redhibition claims.

---

[142]     Testimony of Wayne Wingate.

### F.   Whether Nautimill Waived its Redhibition Claim

Under Louisiana Civil Code article 2548, "[t]he parties may agree to an exclusion or limitation of the warranty against redhibitory defects."  To be effective under this article, any contractual waiver "must be clear and unambiguous and must be brought to the attention of the buyer."  *Id.*  The seller has the burden of proving that the buyer waived the warranties against redhibitory defects.  *Berney v. Rountree Olds-Cadillac Co., Inc.*, 763 So. 2d 799, 805 (La. App. 2 Cir. 2000).  In determining whether a waiver is clear and unambiguous, "commercially sophisticated parties" are "held to a higher standard than an unknowledgeable consumer."  *Datamatic, Inc. v. Int'l Bus. Machines Corp.*, 795 F.2d 458, 465 (5th Cir. 1986).

In this case, the Vessel Purchase Agreement and the bill of sale contain conflicting warranty provisions.  Under the Vessel Purchase Agreement, the vessel was sold "AS IS, WHERE IS, without warranties of merchantability or fitness for any particular use."[143]  This language, standing alone, may be sufficient to bar claims under redhibition.  *See Datamatic*, 795 F.2d at 460 (holding that redhibition claims were barred by contractual provision waiving "warranties express or implied, including but not limited to the implied warranty of merchantability.").  Hasselman, however, objected by

---

[143]    Joint Ex. 52.

29

email to the inclusion of similar language in the bill of sale, saying that "[t]he NO warranty clause was NOT what Robert had told me," and demanding the provision be altered.[144]  Jessica Boudreaux, an owner of Legacy,[145] responded "[y]es, we do agree to this,"[146] and the bill of sale was changed to include a one year warranty on vessel construction and workmanship.[147]  The updated document disclaims any warranty for failures due to neglect, misuse, or normal wear and tear, but is silent as to warranties of merchantability or against redhibitory defect.[148]

Given this conflicting language—and the compelling evidence that the later-drafted bill of sale reflects the intent of the parties—the Court finds that, even considering Nautimill's relative commercial sophistication, Legacy has failed to meet its burden to show that any warranty waiver was "clear and unambiguous."[149]  *See, e.g., Berney,* 763 So. 2d at 805 (holding that although the buyer signed a form stating "that there are no warranties and that the buyer specifically waives the implied warranty provided by Louisiana law,"

---

[144]     Joint Ex. 15.
[145]     Testimony of Robert Boudreaux, Jr.
[146]     *Id.*
[147]     Joint Ex. 37.
[148]     *Id.*
[149]     Furthermore, there is no evidence that Legacy brought the waiver to the attention of the buyer, as required by article 2548.  Application of this requirement seems somewhat incongruous here, however, because Hasselman, the *buyer's* agent, drafted the Vessel Purchase Agreement.

the waiver was not clear and ambiguous because it conflicted with an extended warranty provision).  Nautimill's claims are therefore unaffected by the warranty waiver in the Vessel Purchase Agreement.

> ### G.    Nautimill and Hasselman's Claims for Fraudulent and Negligent Misrepresentation

Because the Court does not credit Hasselman and Captain Perez Castro's testimony regarding Legacy's misrepresentations, Nautimill's claims for fraudulent and negligent misrepresentation must fail.  In the context of a contract of sale, "[t]he elements of an action for fraud are: '(1) a misrepresentation, suppression, or omission of true information; (2) the intent to obtain an unjust advantage or to cause damage or inconvenience to another; and (3) the error induced by a fraudulent act must relate to a circumstance substantially influencing the victim's consent to (a cause of) the contract.'"  *Jones v. Wells Fargo Bank, N.A.*, 626 F. App'x 500, 504-05 (5th Cir. 2015) (quoting *Shelton v. Standard/700 Assocs.,* 798 So. 2d 60, 64 (La. 2001)).  Negligent misrepresentation requires a similar showing: such a claim is made out "when a person, in the course of his business or other matters in which he has a pecuniary interest, supplies false information without exercising reasonable care, for the guidance of others, who justifiably and detrimentally rely on such information and thereby suffer a pecuniary loss." *Fagan v. Lawrence Nathan Associates, Inc.*, 957 F. Supp.

2d 784, 800 (E.D. La. 2013) (quoting *Hardy v. Hartford Ins. Co.*, 236 F.3d 287, 292 (5th Cir. 2001)).

Although the Court finds that Legacy did misrepresent the Legacy Server as a 1,600 horsepower, rather than 1,200 horsepower, vessel, there is no credible evidence that Legacy did so intentionally or without exercising reasonable case. Nautimill has failed to meet its burden to show that Legacy did not genuinely—though wrongly—believe that the Legacy Server's engines produced 800 horsepower each. Furthermore, although Nautimill's expert Wayne Wingate testified that the dock push that Legacy performed to test the vessel is not the most accurate test available, he acknowledged that it is an accepted method for determining total horsepower.[150] Legacy's expert, John Jay Webster, also testified that dock push-style tests are routinely used to determine engine power in the context of vessel sales.[151] Nautimill has failed to show that, in the context of a vessel sale, reliance on the results of a dock push test—even one that is ultimately revealed to be faulty—rises to the level of negligence. Nautimill's claims for fraudulent and negligent misrepresentation therefore lack basis. Hasselman's misrepresentation

---

[150] Testimony of Wayne Wingate.
[151] Testimony of John Jay Webster.

claims against Legacy, which largely mirror Nautimill's, fail for the same reasons.

### H.   Legacy's Claims for Indemnity and Damages Against Hasselman

Legacy's third party complaint against Hasselman asserts claims for indemnity and damages based on Hasselman's alleged misstatements.   As explained above, however, the Court finds that Legacy is not liable under Nautimill's misrepresentation claims.   Nautimill's only remaining claim against Legacy sounds in redhibition, and is based on the vessel's inability to produce 1,600 horsepower.  This claim is grounded in Legacy's own admitted pre-sale representations.   Because Legacy has failed to identify any other injury caused by Hasselman's alleged misrepresentation, Legacy's claims against Hasselman do not survive the above factual findings.

## III.   DAMAGES

### A.   Reduction of the Purchase Price

As detailed above, the Court finds that the Legacy Server's underpowered engines reduce the vessel's usefulness and value such that it must be presumed that a buyer would have paid a lower price.   Under Louisiana law, "such a defect limits the right of a buyer to a reduction of the price." La. Civ. Code art. 2520.  The "general rule" in setting the level of price reduction is that courts must determine the difference "between the value of

the defective thing at the time of sale and the value warranted by the seller." *Bailey v. Delacruz*, 143 So. 3d 1220, 1229 (La. App. 2 Cir. 2014). "One of the principal factors in awarding a reduction in the purchase price is the cost of repairing the defects, which under certain circumstances may be the only consideration." *Berney v. Rountree Olds-Cadillac Co.*, 763 So. 2d 799, 805–06 (La. App. 2 Cir. 2000). The burden of establishing the appropriate magnitude of the price reduction lies with the buyer. *Id.*

Here, the Court finds that the appropriate level of price reduction is the cost to repair the defects, that is the cost to purchase and install 800 horsepower engines. Nautimill argued that the vessel's shafts and bearings must be replaced to accommodate 1,000 horsepower engines. The company presented no evidence, however, that the Legacy Server's shafts and bearings are unfit for a 1,600 horsepower vessel. Furthermore, Robert Boudreaux, Sr. testified that the vessel's shafts would be excessively robust for a 1,200 horsepower vessel, which suggests that they are likely appropriate for a 1,600 horsepower vessel.[152]

In determining the cost of replacement engines, the Court is guided by evidence in the record concerning a price quote that Jessica Boudreaux provided to Hasselman on behalf of R&R Boats for a pair of 751 horsepower

---

[152]     Testimony of Robert Boudreaux, Sr.

Caterpillar 3412 DITA engines on March 21, 2014.[153]   R&R priced these engines at $75,000 each.   Although the quote was for unused surplus engines, rather than reconditioned engines,[154]   Legacy's expert John Jay Webster testified that the price difference between such engines is minimal.[155]   The Court further finds that to the extent the surplus engines are, in fact, more valuable, that difference is offset by the lower horsepower rating.

Captain Maran opined, based on his years of experience working in the field of naval construction, that the cost of removing and replacing the Legacy Server's engines would be $80,000.[156]   The Court finds this estimate to be credible.   Maran also estimated additional repair costs for ten days of dry docking to replace the engines, bearings, shafts, and propellers.   The Court, however, finds that the bearings and shafts need not be replaced and credits Robert Boudreaux, Sr.'s testimony that the vessel need not be placed

---

[153]   Joint Ex. 23.  Captain Maran testified regarding the price of new, 1,000 horsepower engines.  Testimony of Captain Jose Maran.  Because the Court finds that Nautimill is entitled to only 800 horsepower engines, Maran's testimony on this point is unhelpful.

[154]   Investigation by Hasselman later revealed that the engines were in fact heavily used.  Joint Ex. 24.  The evidence in the record suggests, however, that Legacy was unaware of this fact at this time it offered them for $75,000 each.  Joint Ex. 54 at 216, 233.

[155]   Testimony of John Jay Webster.

[156]   Testimony of Captain Jose Maran.

in dry dock to replace only the engines.[157]  Finally, the Court credits Maran's opinion that the estimated cost of recertification of the vessel after replacing the engines is $10,000.[158]

Summing these figures, the Court estimates that the cost to repair the Legacy Server's defects is $240,000.  The Court finds that this total is an appropriate estimate of the difference in value between the Legacy Server and a defect-free 1,600 horsepower pushboat.[159]

### B.    Attorney's Fees, Lost Profits, and Other Damages

In addition to its claims for reduction of the sales price, Nautimill seeks lost profits and attorney's fees.  A "good faith" seller, who unknowingly provides a defective product, is not liable for attorney's fees or lost profits. *See Gaston v. Bobby Johnson Equip. Co.*, 771 So. 2d 848, 855 (La. App. 2 Cir. 2000) ("The jurisprudence construing [the redhibition] provisions holds that while a bad faith seller is liable for damages, including loss of profits and attorney fees, a good faith seller is not.").  "A seller is," however, "deemed to

---

[157]   Testimony of Robert Boudreaux, Sr.

[158]   Testimony of Captain Jose Maran.

[159]   Legacy argues that it is entitled to a credit for Nautimill's use of the Legacy Server.  Such a credit, however, does not apply when a court grants only a reduction of the sales price, rather than full rescission of the sale. *See Weber v. Crescent Ford Truck Sales, Inc.*, 393 So. 2d 919, 924 (La. App. 4 Cir. 1981), *writ denied*, 400 So. 2d 667 (La. 1981) ("[W]here quanti minoris is decreed the seller is not entitled to a credit for use because the buyer retains the thing sold and, as the owner, is entitled to its fruits and use.").

36

know that the thing he sells has a redhibitory defect when he is a manufacturer of that thing." La. Civ. Code art. 2545. The Court finds that, Legacy is a manufacturer of the Legacy Server, and that its knowledge of the defect is therefore presumed.[160] Legacy may therefore be liable for attorney's fees and lost profits. *See, e.g., Foust v. McKnight*, 675 So. 2d 1147, 1150 (La. App. 1 Cir. 1996), *writ denied*, 683 So. 2d 277 (La. 1996) ("Having concluded herein that defendants were manufacturers, we further conclude plaintiffs were entitled to damages and attorney's fees under [article] 2545.").

Nautimill has the burden to demonstrate that the Legacy Server's defective state caused Nautimill to lose profits. *See Land & Marine Servs., Inc. v. Diablo Data Sys., Inc. of Louisiana*, 471 So. 2d 792, 803 (La. Ct. App. 5 Cir. 1985), *writ denied*, 477 So. 2d 102 (La. 1985). Varela testified that a 2,000 horsepower pushboat would have earned $8,000 per day,[161] but Nautimill produced nothing in writing to support this assertion. Even if the

---

[160]    Although the vessel may have been nominally constructed by R&R Boats, another Boudreaux entity, rather than Legacy, the record makes clear that there is little practical division between R&R and Legacy. Furthermore, the uncontested material facts contained in the pretrial order, which bind both parties, state clearly that Legacy—not R&R—reconditioned the Legacy Server's "engines and other propulsion equipment" and installed the vessel's propellers. Uncontested Material Facts 19, 20. Even these limited actions qualify Legacy as a manufacturer. *See Spillers v. Montgomery Ward & Co.*, 294 So. 2d 803, 807 (La. 1974) (seller that modified truck prior to sale was liable as manufacturer).

[161]    Testimony of Ruben Varela.

Court were to credit Varela's testimony, Nautimill has presented no evidence tending to show that it would have earned additional profits with a *1,600 horsepower* pushboat. The Court therefore finds that Nautimill has failed to show that it is entitled to lost profits. The Court finds, however, that Nautimill is entitled to an award of attorney's fees. *See Hollybrook Cottonseed Processing, L.L.C. v. Am. Guarantee & Liab. Ins. Co.*, 772 F.3d 1031, 1037 (5th Cir. 2014) ("[Article] 2545 was designed to impose liability upon the bad faith seller and the manufacturer of a defective product which causes damage to a buyer. That liability expressly includes attorney fees.").

Finally, Nautimill also claims expert witness fees as damages. Federal law governs awards of expert witness fees in a redhibition case brought in federal court. *Cates v. Sears, Roebuck & Co.*, 928 F.2d 679, 689 (5th Cir. 1991). Under 28 U.S.C. section 1920, a prevailing party may recover expert witness fees only for court-appointed experts. *Crawford Fitting Co. v. J. T. Gibbons, Inc.*, 482 U.S. 437, 442 (1987). Nautimill therefore may not recover expert witness fees.

## IV.   CONCLUSION

Based on the above findings of fact and conclusions of law, the Court finds that Nautimill is entitled to recover the following from Legacy:

| Item of Damages | Amount |
|---|---|
| Two 800 Horsepower Engines | $150,000 |
| Engine Installation | $80,000 |
| Recertification of the Vessel | $10,000 |
| **TOTAL:** | **$240,000** |

In addition, Nautimill is entitled to recover attorney's fees.  Counsel for Nautimill are hereby ORDERED to, within five days of the entry of judgment, submit to the Court a sworn affidavit detailing their fees in accordance with Local Rule 54.2.  Finally, the Court finds Hasselman not liable for the claims in Legacy's third party complaint, and Legacy not liable for Hasselman's counterclaims.


New Orleans, Louisiana, this <u>4th</u> day of August, 2016.



_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE